UNITED STATES of America, Appellee,

v.

John Anthony HOUSAND, Appellant.

No. 185, Docket 76–1156.

United States Court of Appeals,
Second Circuit.

Argued Sept. 21, 1976.

Decided Feb. 25, 1977.

---

William H. Clendenen, Jr., New Haven, Conn. (David M. Lesser and Clendenen & Lesser, New Haven, Conn., of counsel), for appellant.

Peter R. Casey, III, Special Atty., U.S. Dept. of Justice, Washington, D.C. (Peter C. Dorsey, U.S. Atty., D. Connecticut, New Haven, Conn., of counsel), for appellee.

Before HAYS, TIMBERS and GUR-FEIN, Circuit Judges.*

GURFEIN, Circuit Judge:

Appellant John Anthony Housand stands convicted of conspiring to violate 18 U.S.C.

---

* Judge Hays concurred in the disposition of the appeal, but has not had an opportunity to review the opinion because of illness.

§ 1001 and § 1503 (18 U.S.C. § 371) and of three counts of making false declarations before a grand jury.[1] Andrew Bucci was tried along with Housand only on the conspiracy count. He is not involved in this appeal. Housand appeals.

Appellant Housand let himself out for hire in May 1972 to kill Daniel LaPolla, a prosecution witness against a quartet who had been indicted for the theft of M–16 rifles from a Rhode Island armory.[2] Housand did not complete his assigned task himself, but LaPolla was, nevertheless, killed by a bomb planted directly by the quartet themselves. The United States indicted the quartet, each of whom was convicted of conspiring to deprive LaPolla of a civil right, death resulting (18 U.S.C. § 241), attempting to impede and intimidate a witness (18 U.S.C. § 1503), and using a dynamite bomb to commit a felony (18 U.S.C. § 844(h) and (i). The four were sentenced to life in prison.

It was Housand's role in the prosecution of the quartet to testify at two trials in the District of Connecticut, in late 1973 and early 1974, that, at a meeting with the quartet and their lawyer, Andrew Bucci, he had let himself out for hire in May 1972 to kill LaPolla for $5,000. At the time of his testimony, Housand was a State prisoner in North Carolina. He was then granted parole by the State, and was relocated by the Federal Government under an assumed name.

On November 13, 1974, Housand appeared at the office of the United States Attorney in New Haven in the company of Bucci and another lawyer and recanted his sworn testimony. Housand told the United States Attorney that there had been no such May 1972 meeting as he had described and that no one had ever approached him to kill LaPolla. He added that certain Government agents and attorneys had known his story was false, but had encouraged his false testimony. On December 6, 1974, Housand repeated his recantation under oath before the Grand Jury.

Then the pendulum swung back, and Housand told an Assistant United States Attorney and federal agents that his trial testimony was actually true, and that he had been induced to recant by the lawyer Bucci so that the quartet would get a new trial. He said that Bucci had promised him a number of things, including $25,000 upon his release if he should be imprisoned because of his recantation.

The Grand Jury indicted appellant on December 11, 1974, but this indictment was dismissed on the Government's motion and a superseding indictment filed, charging him with the crime above stated. Housand was tried and convicted on this indictment before a jury (Clarie, J.), resulting in this appeal.

At the trial the Government produced the various agents and attorneys whom Housand had named as knowing that his trial testimony was false. Each unequivocally denied such knowledge.

Housand testified in his own behalf. He admitted that his recantation and his Grand Jury testimony concerning it were false. He testified that he had recanted out of fear of Andrew Bucci, but he did not testify to specific threats. In rebuttal, the Government produced witnesses who testified that Housand had said, *before* his recantation, that he would recant unless the Government paid him certain moneys which he felt the Government owed him. And, as we have seen, Housand himself admitted that he was offered $25,000.

Housand sought to elicit testimony, in his defense, from Joseph N. Crisafi, who refused to answer on a claim of Fifth Amendment privilege, and who was sustained in his claim of privilege.

On appeal Housand raises the following points:

---

1. Appellant Housand was sentenced to five years on Count One, five years on Count Four to run consecutively with Count One; and five years each on Counts Two and Three to run concurrently with Count Four.

2. The quartet consisted of Robert Joost, David Guillette, William Marrapese and Nicholas Jenni.

(1) That the ruling on Crisafi was prejudicially erroneous. (2) That the charge to the jury on the elements of the defense of coercion erroneously barred the jury from finding that appellant had been "coerced" to make a false recantation. (3) That appellant was denied his constitutional right to a speedy trial. (4) That the perjury counts were fatally defective because the questions posed to Housand before the grand jury were imprecise. (5) That the Government's use of Housand's statements of February 14, 18 and 19, 1975 violated the Sixth Amendment. (6) That appellant had ineffective assistance of counsel. (7) That the charge to the jury failed to specify each element of the substantive offense claimed to be the object of the conspiracy.

Finding no prejudicial error, we affirm.

## I

█ Crisafi had voluntarily testified before the Grand Jury which indicted appellant in December 1974. That indictment was later dismissed. Crisafi testified before the Grand Jury again on January 31, 1975, this time after receiving a grant of immunity.[3]

When Crisafi was summoned by appellant to testify at his trial, he claimed his privilege against self-incrimination. The prosecutor had given Judge Clarie the January 31, 1975 Grand Jury testimony of Crisafi, after his immunization, but, apparently through inadvertence, had not given the judge the December 1974 testimony, elicited before he was granted immunity.

Judge Clarie sustained the claim of privilege and denied the defense request that Crisafi be compelled to testify.

When called to the witness stand, Crisafi was represented by counsel. Crisafi indicated that he had had some prior discussion with appellant's counsel and had advised him that he preferred not to testify. Appellant's counsel then asked a series of general questions relating to Crisafi's Grand Jury testimony and it is to such questions that the witness responded by invoking his Fifth Amendment privilege. No questions were asked directly concerning any knowledge he might have on the issue of coercion. Instead, counsel stated that "that's all I can ask him, if the Court please. Obviously he is not going to answer any inquiry with respect to what he said before the Grand Jury, and he'll invoke the Fifth in respect to whether or not it is truthful. That's all, thank you."[4]

It was unmistakably clear that the only crime with regard to which Crisafi was asserting his privilege was perjury. Judge Clarie and defense counsel recognized this, and is evident from the colloquy in which counsel conceded that a witness who had received immunity cannot be "immunized from perjury." No request was made for the further immunization of Crisafi.[5]

The Grand Jury testimony of Crisafi was ordered sealed by the trial judge. We have read it to see what Judge Clarie had before him when he made his ruling.[6]

---

3. The Government notified the defense that Crisafi had testified before the Grand Jury on December 16, 1974, but failed to notify the defense of his later January 1975 appearance under immunity, but counsel learned of the immunity grant at trial. His voluntary testimony in the Grand Jury, by the weight of authority, did not waive his right to claim privilege at trial—a separate proceeding. VIII *Wigmore* § 2276, p. 470 (McNaughton ed. 1961). *United States v. Miranti*, 253 F.2d 135 (2d Cir. 1958); *but cf. Ellis v. United States*, 135 U.S.App.D.C. 35, 416 F.2d 791, 800 (1969).

4. Counsel had not seen Crisafi's testimony in the Grand Jury. All he knew was that Crisafi had testified and that the prosecutor had elected not to call him as a Government witness, leading to the inference that an examiner might hit pay-dirt. But he was apparently afraid to ask direct questions on what had occurred, because he did not know what answer would be forthcoming. Cautiously, he sought to probe what Crisafi had testified to in the Grand Jury and was rebuffed on the claim of privilege.

5. Since the voluntary December testimony of Crisafi was not called to Judge Clarie's attention, we proceed directly to consider what was before the judge when he made his rulings—the "immunized" January testimony.

6. Crisafi was apparently afraid to repeat his testimony in a public trial and it would be unfair for us to recount it unless it were necessary to make a specific point.

We sympathize with and admire the trial judges who, in the heat of trial, are suddenly confronted with the most delicate constitutional issues and decide them with only their sound legal intuition and their general store of memory to guide them. In this case, none of the lawyers was of any real help to Judge Clarie. But we believe that he found the right answer.

The issue raised involved the relationship between the constitutional privilege against self-incrimination, the immunity statutes and the crime of making false declarations.[7]

■ The classic cases are those in which the defendant had been prosecuted for a perjury committed after immunity has been conferred. It is the constitutional hornbook rule that perjury committed under an immunity grant does not make the perjurer immune from prosecution for the perjury, even if the particular immunity statute does not have an exception for perjury prosecutions. *Glickstein v. United States*, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 (1911); *United States v. Bryan*, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *Bryson v. United States*, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969); *Edelstein v. United States*, 149 F. 636 (8th Cir. 1906); VIII *Wigmore on Evidence* § 2282 at p. 512. One of the grounds for this conclusion is that the immunity granted relates to past crimes and that the perjury is itself a *new* crime with respect to which no immunity was conferred. We have recently adopted this rationale in *United States v. Tramunti*, 500 F.2d 1334, 1344 (2d Cir.), *cert. denied* , 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974); *see also United States v. Pappadio*, 346 F.2d 5, 8 (2d Cir. 1965).

In *Tramunti* the defendant was convicted of giving false testimony under oath in violation of 18 U.S.C. § 1623. The perjury alleged was that Tramunti, while on trial as a defendant in a conspiracy, mail fraud and stock fraud case, lied when he took the stand concerning meetings with co-conspirators. On cross-examination at his false statement trial, Tramunti was confronted with Grand Jury testimony that he had given five years before, in 1966, after he had been granted immunity (though the fact that immunity had been granted did not surface until after the trial). The prior testimony was used to impeach Tramunti's credibility (by showing his ability to remember facts on this trial which he could not remember in 1966). The question was whether the testimony was properly usable, even though a literal application of the statute and the constitutional implication of *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), appeared to make it non-usable. We held that there was no error in allowing its use for impeachment, relying on the doctrine that perjury is excluded from the grant of immunity, and on the fact that this testimony was *perjurious*. We recognized that the basis for the decision was that the testimony was not truthful. If it had been truthful, it would not have been admissible to prove perjury, for its use would have been proscribed by the immunity granted. *Cameron v. United States*, 231 U.S. 710, 34 S.Ct. 244, 58 L.Ed. 448 (1914); *United States v. Hockenberry*, 474 F.2d 247 (3d Cir. 1973). Our citation of these cases in *Tramunti* emphasizes that if we had found the 1966 testimony *truthful* it would not have been held admissible for any purpose.[8]

7. 18 U.S.C. § 6002, the immunity statute, provides in pertinent part:

"Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to . . . a court or grand jury of the United States, . . . and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information

compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

8. Judge Mulligan did not have to consider, therefore, whether under *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), immunized testimony is like suppressed testimony which, even if not admissible on the

We next turn to the case where the witness has thus far testified only once under immunity grant, and now claims his privilege against testifying again on the same subject. If he testified *falsely* the first time, his perjury committed under a grant of immunity may, nevertheless, be the predicate for a perjury prosecution. *Glickstein v. United States* and cases cited *supra. Kronick v. United States,* 343 F.2d 436 (9th Cir. 1965). In many cases, the perjury can be proved by extrinsic evidence without the use of a subsequent contradiction. The Fifth Amendment privilege question arises when the witness refuses to answer on the ground that his *second* version of the event may result in his prosecution for perjury. The claim may be tested in the following manner. If the immunized prior testimony was truthful, it may not be used against the witness who, on the second occasion, lies under oath. Of course, if the second testimony is perjurious, it may be the subject of a perjury prosecution based on extrinsic evidence. If, on the other hand, the original testimony may be claimed by a prosecutor to have been perjurious, the witness is in peril if he now tells the truth. Even if we assume that a perjury count based merely on the contradiction (18 U.S.C. § 1623(c)) [9] would not stand up, because the original perjury would not be admissible *until* it is shown to be false, the giving of truthful testimony on the second occasion could surely trigger investigation of whether the original testimony was false, and whether that could be proved by extrinsic evidence. This is a reasonable cause for apprehension, and supports the claim of privilege. *See United States v. Hoffman,* 260 F.Supp. 566 (M.D.Pa.1966). *Cf. In re Bonk,* 527 F.2d 120 (7th Cir. 1975); *In re Grand Jury Proceedings,* 509 F.2d 1349 (5th Cir. 1975); *United States v. Alter,* 482 F.2d 1016 (9th Cir. 1973) (contrary result when second testimony is given under immunity grant). That is the position in which Crisafi stood.

Accordingly, since Crisafi was not offered immunity at the trial of Housand, he was in peril of a prosecution for perjury or making false declarations, in spite of the earlier immunization, if he had already lied in .the Grand Jury and would now make a truthful contradictory statement. The witness Crisafi, consequently, may have had reasonable cause to apprehend danger from a direct answer, *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), and "the trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' See Taft, J., in *Ex parte Irvine,* 74 F. 954, 960 (C.C.S.D.Ohio, 1896)." *Hoffman,* 341 U.S. at 487, 71 S.Ct. at 818.

We note that in this case Crisafi happened to be a witness called by the defendant. The situation in which a witness who had been granted immunity for his Grand Jury testimony balks at testifying for the *prosecution* upon the trial is more likely to occur, especially in organized crime prosecutions. If Crisafi had been a *Government* witness, the prosecution could have requested and obtained a new grant of immunity to compel him to answer.[10] *See*

direct case is, nevertheless, available for the limited purpose of impeachment—the situation in *Tramunti.* In *Tramunti,* the fact that the original testimony was given under use immunity became apparent only *after* the trial, so that the court had the benefit of hindsight in determining that the original testimony was *false.* We do not suggest what would have been proper if the question had been directly raised in the *Tramunti* trial—how the judge would have been able to find whether the immunized testimony was true or false.

9. The recent false declarations statute provides that where the defendant under oath has made two declarations which are inconsistent to the degree that one of them is necessarily false, the indictment need not specify which declaration is false, and mere proof of the contradiction is enough for conviction, 18 U.S.C. § 1623(c).

10. If, after the new immunity grant, he repeats his earlier testimony, the grant of the new immunity was worthwhile, for it made his testimony constitutionally possible. If, on the other hand, he contradicts his Grand Jury testimony, the Government can at least introduce his prior inconsistent testimony in the Grand Jury as evidence at the trial despite the contradiction. Fed.Rules of Evidence 801(a)(1).

*United States v. Seewald,* 450 F.2d 1159, 1162 (2d Cir. 1971). The solution suggested by Justice Brandeis in *McCarthy v. Arndstein,* 266 U.S. 34, 42, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924), has already been followed: "If Congress should hereafter conclude that a full disclosure . . . by the witnesses is of greater importance than the possibility of punishing them for some crime in the past, it can, as in other cases, confer the power of unrestricted examination by providing complete immunity." Once the trial judge determines that the claim of privilege is proper, however, he cannot himself confer immunity, for Congress has limited the power to grant immunity—in the face of a valid claim of privilege—to a limited group of federal officials who may apply to the court to compel the witness to testify under immunity. *See Ellis v. United States,* 135 U.S.App.D.C. 35, 416 F.2d 791, 796 (1969), and cases cited. The judicial role is limited to seeing that the case is within the framework of the immunity statute. *See Ullmann v. United States,* 350 U.S. 422, 434, 76 S.Ct. 497, 100 L.Ed. 511 (1956).

As we have seen, no request that Crisafi be granted immunity was made to the trial judge, in any event. We need not discuss the obvious policy problems that would have arisen upon such a request made to the prosecution. The request here was simply the usual one, for the judge to require the witness to answer. The judge properly sustained the claim of privilege, and, having sustained it, could himself go no further in immunizing the testimony to be elicited.

## II

Appellant at his trial testified that his recantation was, indeed, false, but that he had given it out of fear for his life and that of his family. While at times in his testimony he averred that Bucci had threatened him, he never gave chapter and verse. He repeated no words of threat, nor did he give time or place of its occurrence. His defense boiled down to a general fear to being killed if he did not recant, the prevailing fear being derived from circumstances alone.

Technically, his defense was that of duress or coercion. Judge Clarie gave a standard instruction in which he said that "to provide a legal excuse for any criminal conduct, compulsion or coercion must be present and immediate, and of such nature as to induce a well-founded fear of impending death, or serious bodily injury; and there must be no reasonable opportunity to escape the compulsion, without committing the crime, or participating in the commission of the crime."

Appellant attacks the instruction as insufficient.[11]

The issue presented to the jury was whether Housand was more influenced to recant by the refusal of the Government to pay him $5,000 he claimed it owed him, and by Bucci's promise to give him money to get out of Connecticut, plus $25,000, if he had to go to jail, than by coercion allegedly practiced upon him by Bucci and the others.

The contention is that the necessary elements for coercion stated by the trial court were too restrictive. Appellant argues that even if he was not in present and immediate danger, he could still be under an excusable coercion because of fear of future harm. Of course, Housand had even more to fear *before* he testified in the first instance, when killing him would have eliminated a potential witness, than after the conviction of the quartet, when killing him could only satisfy a sense of revenge. Yet Housand offered no compelling testimony on why he would be in more danger if he refused to recant than he had been before.

11. His own request to charge was, in part, as follows:

". . . the law recognizes as a defense the fact that a defendant's actions were the product of duress or coercion. Therefore, if from the evidence, you find the defendant could reasonably believe that his failure to act would result in death or serious bodily injury to himself or his family, and that his actions were the product of duress or coercion rather than a voluntary exercise of his will, then you must find the defendant not guilty of violating 18 U.S.C. § 1623." (Nos. 21, 22).

There is a difference between fear to testify which does not excuse the witness from doing his duty, and coercion which must be strong enough to make a criminal act less than willful. The problem, unfortunately, is one that pervades our society.

Compassion unrestrained would free the fearful from being compelled to testify. Yet, community life must take a harsher view. The bystander at a mugging is truly an object of compassion, and the judge may even shed a tear as he sentences him for contempt of court or for false swearing. Though sentiment is hardly the due of a hardened criminal like Housand, who chose a life of crime and its attendant hazards, we must, nevertheless, afford him a legal test that does not prejudice him as an alleged member of a class touched by fear.

The dilemma of society on a claim of fear and its solution was well expressed by Justice Frankfurter:

> "If two persons witness an offense—one being an innocent bystander and the other an accomplice who is thereafter imprisoned for his participation—the latter has no more right to keep silent than the former. The Government of course has an obligation to protect its citizens from harm. But fear of reprisal offers an immunized prisoner no more dispensation from testifying than it does any innocent bystander without a record." *Piemonte v. United States*, 367 U.S. 556, 559, n.2, 81 S.Ct. 1720, 1722, n.2, 6 L.Ed.2d 1028.

As a corollary, of course, it gives him no dispensation to commit perjury or to conspire to obstruct justice. *See In re Grand Jury Proceedings*, 509 F.2d 1349 (5th Cir. 1975); *LaTona v. United States*, 449 F.2d 121, 122 (8th Cir. 1971).

■ To make fear of one's life sufficient to excuse not only testimony but also the commission of a crime, the fear must be more than a general apprehension of danger, particularly if one has the chance to escape or to seek the protection of the Government.

■ The proposed Model Penal Code makes nothing less than a *threat* of force or its actual use the basis for a defense of coercion, § 2.09. Here there was no specific threat. The appellant had many opportunities to avoid Bucci and to seek help from the federal officials. In these circumstances, we see no reason to depart from the commonly accepted rule which is as it was stated by Judge Clarie. *See Shannon v. United States*, 76 F.2d 490, 493 (10th Cir. 1935).

### III

■ The claim that appellant was denied a speedy trial does not impress us. The Government filed its notice of readiness on April 11, 1975, within six months of indictment in compliance with Rule 4 of the District of Connecticut plan. Thereafter, both defendants, Bucci and appellant, made motions that were not decided until June 13. On September 22, the case was assigned as the first jury case for September 23. That day the trial could not begin because of an actual engagement of defense counsel. The only delay of which appellant can complain was the three months from June 13 to September 23, hardly enough to invoke our adverse review under *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In any event, as we have recently repeated, the failure to raise the point in the trial court precludes its consideration on appeal. *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975).

We have examined the other claims of error, and find them to be without merit.

Affirmed.