**UNITED STATES of America, Plaintiff,**

v.

**Kathleen HARRIS, Defendant.**

**Crim. No. 91–96–05.**

United States District Court,
N.D. West Virginia.

Dec. 12, 1991.

---

William A. Kolibash, U.S. Atty., Wheeling, W.Va., for plaintiff.

Dina Mohler, Charleston, W.Va., for defendant.

## MEMORANDUM OPINION

MAXWELL, Chief Judge.

Kathleen Harris was indicted by the August 16, 1991 return of the federal Grand Jury in this district, charging her and others with conspiracy to defraud the United States government, aiding and abetting in the presentation of false claims to the government, and mail fraud and/or aiding

and abetting in the commission of mail fraud. In addition, Kathleen Harris is charged in Count 63 with making false declarations before a grand jury or the court in violation of Title 18, U.S.C., § 1623. During the month of August, 1991, the grand jury was in session on four days: August 13, 14, 15, and 16.

On August 21, 1991 the defendant filed her motion to dismiss the indictment, alleging that the government's use of evidence with regard to Mrs. Harris violates the rule of *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In order to protect the integrity of the judicial process, the Court held a *"Kastigar* hearing"[1] and heard testimony and the able argument of counsel with regard to the motion and issues raised and suggested therein.

For the reasons articulated below, the Court believes that the government has violated the rule of *Kastigar* and, accordingly, except for Count 63, the Indictment must be dismissed insofar as it pertains to Kathleen Harris.

Armed with search warrants issued upon the affidavit of Steven Misko, a Special Agent at the Department of Defense, Office of the Inspector General, Defense Criminal Investigative Service (DCIS) and assigned to the DCIS Pittsburgh Resident Agency, the government executed searches of the facilities of Rubber Crafters, Inc., (Rubber Crafters)[2] at Grantsville, Smithville, Cairo, and Richwood, West Virginia and perhaps its corporate headquarters at Grantsville, West Virginia on August 8, 1988. The record of a companion miscellaneous matter, *In re Rubbercrafters, Inc.*, Miscellaneous Action No. 89–54–W, reveals that the government seized some ninety-six (96) boxes[3] of documents[4] during the execution of these searches.

---

1. *See e.g., United States v. Garrett* 797 F.2d 656, 663–65 (8th Cir.1986); *United States v. Zielezinski,* 740 F.2d 727, 734 (9th Cir.1984).

2. The principal business of Rubber Crafters is the manufacturer of various products such as inflatable life boats for sale pursuant to its contracts with the United States government for ultimate distribution and use by the United States Navy.

3. At a hearing conducted in the Miscellaneous matter on September 20, 1989, Mr. Misko testi-

fied, "to define the term 'boxes,' I would have to say that includes labor distribution sheets which were in blue folders and we did not put them in boxes, we labeled those."

4. The record indicates that nearly all of the seized materials were documents and that the government also seized three (3) boxes of "lab samples," pieces of material indicative of the fabric of which certain of the products of Rubber Crafters are constructed.

Kathleen Harris is an employee of Rubber Crafters and has been so employed for the past sixteen years, for several of these years and most recently since October of 1985 serving as Quality Control Manager, responsible for supervision of testing, inspection, and packing of Rubber Crafters products. Although she is primarily located at Grantsville, her responsibilities take her to the other Rubber Crafters facilities as well. On August 8, 1988 she was at the Smithville facility where, during the search of that facility, the seizure included documents located in her office, including a particular manila file folder with "KATHY HARRIS PERSONAL" printed horizontally in large upper case blue lettering across its cover.[5]

█ On March 22, 1989 the government entered into a one-page letter immunity agreement with Kathleen Harris wherein the government promised use and derivative use immunity in exchange for her full cooperation. The sum and substance of the agreement, contained in the three-paragraph body of the government's March 22, 1989 letter which was approved and signed by Kathleen Harris on that date, is as follows:

It is agreed between the United States and you as follows:

1. You will be completely forthright and truthful with federal officials in the Northern District of West Virginia with regard to all inquiries made of you and will give signed, sworn statements and grand jury and trial testimony relative thereto. You will submit to a polygraph examination, if requested to do so by the United States Attorney's office, to authenticate your truthfulness.

2. Nothing contained in any statement or testimony given by you pursuant to this agreement or any evidence developed therefrom, will be used against you directly or indirectly in any criminal proceedings. However, this agreement does not prevent United States from prosecuting you for perjury or the giving of a false statement to federal agents should such a situation occur as a result of your complying with paragraph one of this letter.

3. This written agreement constitutes the entire agreement between the United States and you.

It is the interplay between this agreement and the referenced "KATHY HARRIS PERSONAL" file which forms the basis of Mrs. Harris' *Kastigar* motion.[6]

On March 22, 1989 subsequent to the execution of her immunity agreement Kathleen Harris was debriefed by Assistant United States Attorney Michael D. Stein, Special Agent Misko, and others in Pittsburgh, Pennsylvania at the DCIS offices. At that debriefing[7] Kathleen Harris reviewed her employment history and various aspects of her responsibilities at Rubber Crafters as a Quality Control Manager. Next, the Assistant United States Attorney's summary of the interview reflects that Mrs. Harris made specific comments, apparently responding seriatim to the numbered paragraphs of the Misko affidavit.

---

5. A xerox copy of the face of this file folder was introduced as government's Exhibit 2 at a hearing held in the Miscellaneous Action on May 22–23, 1991. The testimony of Special Agent Paul Ziegler indicated that Exhibit 2 was copied from the cover of a file contained in box 012–88 (S–1). Special Agent Ziegler, the agent now responsible for the investigation of Rubber Crafters, also testified that he first became aware of the file and its contents when he conducted a document-by-document review of the seized Rubber Crafters materials during the two weeks immediately prior to the May 22–23, 1991 hearing. The agent also testified that he reviewed the actual contents of the "KATHY HARRIS PERSONAL" file for the first time on May 21, 1991.

6. The Court would note that although the Motion by Kathleen Harris to Dismiss the Indictment and for a *Kastigar* hearing suggests that the referenced written agreement was modified "by the Assistant United States Attorney during the Grand Jury appearance of Mrs. Harris on February 27, 1991 as well as on other occasions" evidence supporting that contention was not presented on October 10, 1991 and, accordingly, the issue does not warrant further consideration at this time.

7. At the October 10, 1991 hearing Mrs. Harris introduced as Defendant's Exhibit 1 a five-page typewritten document which the parties agree is Mr. Stein's file memorandum regarding the interview. It would appear that certain portions of the document have been excised.

With regard to her response to Paragraph 18 of the affidavit [8] the prosecutor's summary covers the better part of two and one-half single spaced typewritten pages. At unnumbered page 4 of his summary the Assistant United States Attorney recorded Kathleen Harris' cooperation as follows:

> Whenever there are two or more repairs in an area covered by one hot iron mark (no matter how large, even if made with consecutive applications), she would assume that it was one repair, and subtract the other indicated repairs even though the repairs could have been made at different times, and her visual inspection would not be good enough to detect that. Kathy made new repair sheets whenever she found a repair on a boat that looked to her to have been made before vulcanization. Pieri went over the boats, and without signing anything approved her new count. The new repair sheets were kept in a folder marked: "Kathy Harris personal". Also in this folder were kept three typed lists: (1) "MK–6 BOATS WITH 15 OR MORE REPAIRS", i.e. boats that were reevaluated and flunked because they still had more than 15 repairs; (2) "MK–6 BOATS OK'D AFTER EVALUATION OF REPAIRS" i.e. boats that had more than 15 repairs before reevaluation that were recounted to have less than 15 repairs and put back into production; and (3) "... EVALUATION NOT NECESSARY AS BOATS DO NOT EXCEED REQUIREMENT", i.e. boats that had less than 15 repairs (and needed no reevaluation).

In addition page 4 of the prosecutor's summary reflects as follows:

> Boats that were reevaluated to have less than 15 repairs were put back into production with QAR Pieri's knowledge, accompanied by the new repair sheet that Kathy prepared. (The old one being maintained in the file that she maintained marked Kathy Harris personal.) (She thinks that the new repair sheet had a *copy* of the old repair sheet attached to it.)
> *The decision to reevaluate* the number of repairs on boats with 15 or more repairs *was made* at a management meeting *somewhere between January and March of 1987.*
> The meeting was attended by Del Mossor, Anita Eagle, Pete Zanonni, and Fred Jiles; minutes were taken by Anita, who probably typed them up herself. She did not implement the policy until she ran it by QAR Pieri, and he approved it.

(Emphasis in the original.)

On July 22, 1991 Assistant United States Attorney Stein caused a Subpoena to Testify Before Grand Jury (Form AO 110) to be issued to Kathleen Harris. The subpoena commanded Mrs. Harris to report on August 14, 1991 at 9:00 A.M., the second day of the scheduled four-day grand jury session. However, on August 5, 1991 the Assistant United States Attorney wrote to Dina M. Mohler, Kathleen Harris' attorney, advising as follows:

> I recently caused a subpoena to be issued for Kathleen Harris's attendance at the next grand jury session. However, between the time of the preparation of the subpoena and now, Ms. Harris's status has been changed from an immunized witness to a subject of the investigation. The reason for the change is three fold: First, it is my belief that Ms. Harris has

---

8. Paragraph 18 of the Misko affidavit reads as follows:

18. PB–03 [Confidential Informant 3] stated that among several methods used to repair leaks in the MK–6 life boat, the best method to conceal repairs was to "cold cure the tape," i.e., add accelerant to vulcanized cement and apply same to areas of repair. This method would effectively camouflage "hot iron marks" a patent sign that an area contained a repair. This method would also fraudulently reduce the number of repairs reflected on the repair sheet for the affected Lifeboat(s). David Mosser, Production Manager at the R/C Smithville Plant instructed PB–03 and other repair personnel to count any number of repairs in an eight (8) to twelve (12) inch area as one repair. Personnel would "hot iron" the entire area so as to make it look like one large repair. Mosser also instructed his repair personnel to destroy repair sheets (one per Lifeboat) of Lifeboats returned to Smithville for the R/C Cairo plant. Lifeboats returned from this latter plant are allegedly in very poor condition due to the numerous amount of leaks or slip seams. Repair personnel in Smithville would formulate a new repair sheet for these Lifeboats that would reflect fifteen (15) or less repairs which would appear to qualify these Lifeboats for shipment, in conformance with the contract.

never been completely truthful with our office (and therefore has been in breach of the immunity agreement from the beginning); Second, it is my belief that Ms. Harris committed perjury during her testimony before Judge Maxwell; and third, I have recently been made aware of documentary evidence proving that, form [sic] the beginning, Ms. Harris was a major player in the scheme to defraud. Before deciding to ask the grand jury to indict Ms. Harris, I went through the arduous task of tracing all evidence against Ms. Harris to make sure that none of it is tainted by her proffers, or grand jury testimony. I am certain that the evidence against Ms. Harris is untainted with respect to the proposed conspiracy, substantive fraud on the government, mail fraud, and perjury counts. However, that is not the case with respect to the proposed obstruction of justice counts. Accordingly, Ms. Harris will not be named in such a count.

Because of Ms. Harris's change of status, we are releasing her from the subpoena. However, I am sure that the grand jury will still be interested in hearing from Ms. Harris. Therefore, your client is invited to appear before the grand jury, without any grant of immunity.

On August 16, 1991 the grand jury returned its indictment charging Kathleen Harris as above-described. Count 1 charges Mrs. Harris and others with conspiracy to defraud the United States by obtaining and aiding to obtain the payment of false, fictitious, and fraudulent claims in violation of Title 18, U.S.C., § 286, alleging *inter alia* that she prepared fraudulent records regarding various MK–6 lifeboats. Counts 2 and 3 charge Mrs. Harris and others with knowing submission of false claims (invoices) to the government in violation of Title 18, U.S.C., §§ 2 and 287. In Counts 32 through 59 the government has charged that Kathleen Harris and others, having devised a scheme to defraud, placed and caused to be placed on various dates, envelopes containing various Material Inspection and Receiving Reports for delivery by the United States Postal Service in violation of Title 18, U.S.C., §§ 2 and 1341. Finally, the government charges Kathleen

Harris in Count 63 with perjury in violation of Title 18, U.S.C., § 1623.

The rule in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) and its progeny directs that any grant of immunity must leave the witness and the government "in substantially the same position as if the witness had claimed privilege." *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661. There, of course, the Supreme Court upheld the constitutionality of the federal use immunity statute, 18 U.S.C. §§ 6002–6003. In reaching its decision the Court indicated that

> [t]he privilege [against self incrimination] has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to ... criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived *directly* and *indirectly* therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the underlying testimony cannot lead to the infliction of criminal penalties on the witness.

*Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661 (quoting *Ullman v. United States*, 350 U.S. 422, 438–439, 76 S.Ct. 497, 506–507, 100 L.Ed. 511 (1956)) (quoting *Boyd v. United States*, 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886)) (emphasis supplied). Here, although the scope of the witness' immunity will be defined by the government's informal letter promises instead of the formal court order envisioned by the statute, that scope may not be construed more narrowly than the Fifth Amendment privilege which the witness surrendered as she provided statements, gave testimony, or otherwise cooperated with the government pursuant to their agreement. *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661. Moreover, the informal immunity which the government grants must provide a very substantial protection: "a comprehensive safeguard, barring the use of compelled testimony as an 'investigative lead,' and also barring the use of any evi-

dence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664–65 (citations omitted).

In a *Kastigar* hearing the burden upon the immunized witness is light: she need only show that she testified [9] under a grant of immunity in order to shift to the government "the burden of showing that [its] evidence is not tainted by establishing that [it] had an independent, legitimate source for the disputed evidence." *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665 (quoting *Murphy v. Waterfront Comm'n.,* 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1609 n. 18, 12 L.Ed.2d 678 (1964)). As the Supreme Court explained, "[t]his burden of proof ... is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source *wholly independent* of the compelled testimony." *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665 (emphasis supplied).

As its first hurdle then the government must demonstrate that its indictment rests soundly upon an independent and untainted presentation. That is, the government must show that the entire basis of the indictment, as far as Mrs. Harris is concerned, is free of the voiceprints of her immunized statements and testimony.

> Where immunized testimony is used before a grand jury, the prohibited act is simultaneous and coterminous with the presentation; indeed, they are one and the same. There is no independent violation that can be remedied by a device such as the exclusionary rule: the grand jury process itself is violated and corrupted, and the indictment becomes indistinguishable from the constitutional and statutory transgression.

*United States v. North,* 910 F.2d 843, 869 (D.C.Cir.1990).

Under the teachings of *Kastigar,* if the government is unable to affirmatively demonstrate [10] that the indictment flows entirely from legitimate sources wholly independent of the immunized cooperation of Kathleen Harris, it must be dismissed. *See United States v. Garrett,* 797 F.2d 656, 665 (8th Cir.1986). *North* is instructive:

> *Kastigar* does not prohibit simply "a whole lot of use," or "excessive use," or "primary use" of compelled testimony. It prohibits *"any* use," direct or indirect. From a prosecutor's standpoint, an unhappy byproduct of the Fifth Amendment is that *Kastigar* may very well require a trial within a trial (or trial before, during, or after the trial) if such a proceeding is necessary for the Court to determine whether or not the government has in any fashion used compelled testimony to indict or convict a defendant.

*United States v. North,* 910 F.2d 843, 861 (D.C.Cir.1990). Accordingly, in order to meet its burden the government must affirmatively show that no use whatsoever was made of Mrs. Harris' immunized statements and testimony, either by the witnesses who testified before the Grand Jury or by the Assistant United States Attorney in his preparation of his case or his examination of such Grand Jury witnesses. *See United States v. North,* 910 F.2d 843, 872 (D.C.Cir.1990).

The prosecutor admits and the testimony of Special Agent Paul Zigler confirms that each and every indictment allegation charging Kathleen Harris, except for Count 63, flows directly from information contained in the "KATHY HARRIS PERSONAL" file as related to the Grand Jury by the testimony of Special Agent Zigler. The prosecutor maintains, however, that this use of the "KATHY HARRIS PERSONAL" file is not prohibited by the rule of *Kastigar.* He suggests that although he, Special Agent Misko (Special Agent Zi-

---

**9.** Although Mrs. Harris' debriefing may technically fall short of the letter of her immunity agreement (*i.e.,* "signed, sworn statements and grand jury and trial testimony"), the government does not contend that the immunized cooperation at issue here is outside the purview of *Kastigar.*

**10.** Although the Supreme Court characterized the government's burden as "heavy" most courts following *Kastigar* have employed the "preponderance of the evidence" test. *United States v. North,* 910 F.2d 843, 854 (D.C.Cir.1990).

gler's predecessor), and others conducted the March 22, 1989 interview with Kathleen Harris [11], Special Agent Zigler's discovery of the particular file was not connected in any way to the immunized cooperation of Kathleen Harris; thus, the government argues, its use against Mrs. Harris is not prohibited by *Kastigar.*

The Assistant United States Attorney explained that by the conclusion of the Kathleen Harris interview on March 22, 1989 he had decided that the information provided by Mrs. Harris was "at odds with other information" obtained during the government's investigation of the case and that he, accordingly, delayed further interview of Mrs. Harris until he "knew everything" about the case. The Assistant United States Attorney explained that as he had decided that Mrs. Harris "was not truthful and that he did not intend to use her anymore," he reproduced his handwritten notes sometime later in typewritten form, placed them in a file, and forgot about them.[12]

On May 22–23, 1991 a hearing was held in Miscellaneous Action No. 89–54–W on the motion of Rubber Crafters for the return of certain of its property, documents which Rubber Crafters asserted the government had seized from its facilities on August 8, 1988 and had neglected to return. Although the government had earlier indicated that it had returned either the original or a photocopy of every document which had been seized from Rubber Crafters, the company urged that certain of its documents, for which the government had caused recent grand jury subpoenas to be issued, were in the possession of Rubber Crafters on August 8, 1988, were seized by the government, but were not returned in either original or photocopy form.

Prior to this hearing the Assistant United States Attorney caused Agent Zigler to inspect every Rubber Crafter document in the government's possession to determine whether the subpoenaed documents were, in fact, in the government's custody. Agent Zigler determined that his search, which consumed some eighty hours during the two-week period immediately preceding the May 22–23, 1991 hearing, revealed that the particular requested documents were not in the government's possession in either original or photocopy form. Special Agent Zigler testified that it was during this search that he discovered the "KATHY HARRIS PERSONAL" file.[13]

The prosecutor related that prior to the referenced hearing Special Agent Zigler called to inform him of the "real good stuff" which the "KATHY HARRIS PERSONAL" file contained; however, the Assistant United States Attorney advised Agent Zigler that he "did not have time to talk." Prior to the hearing itself, Zigler provided copies from the file to the Assistant United States Attorney and, subsequently, the government's attorney received a copy of the entire file from Special Agent Zigler. Sometime later the Assistant United States Attorney reviewed the contents of the file, which he found to be "spectacular damaging," and called Special Agent Zigler to discuss the file in more detail.

Following this, the Assistant United States Attorney relates, he concluded that Kathleen Harris was a "participant and major player" and, accordingly, revised his "draft" indictment [14] to include the allega-

---

**11.** It was at this interview that Mrs. Harris advised that recreated "repair sheets" were kept in a file marked "KATHY HARRIS PERSONAL." The record indicates that this revelation was not considered particularly insignificant at the time for those at the interview searched for but were unable to find the referenced file at the DCIS offices.

**12.** The Assistant United States Attorney also testified that as he did not intend to use the cooperating witness anymore, he simply "was not thinking of the 'KATHY HARRIS PERSONAL' file."

**13.** The Special Agent testified that neither Special Agent Misko nor any Assistant United States Attorney told him that the "KATHY HARRIS PERSONAL" file existed. His testimony is that he discovered it on his own.

**14.** The Assistant United States Attorney testified that he had earlier provided Special Agent Zigler with copies of previous drafts of his indictment but that those proposals did not include allegations against Kathleen Harris.

tions against her. The Assistant United States Attorney testified that he was careful to limit the Kathleen Harris charges "strictly to documents which came out of the 'KATHY HARRIS PERSONAL' file." Apparently, these events coincide with a point in time, eight days prior to the next scheduled grand jury session, when the Assistant United States Attorney wrote his August 5, 1991 letter advising defense counsel that " ... I have recently been made aware of documentary evidence proving that, form [sic] the beginning, Ms. Harris was a major player in the scheme to defraud." Following this, Assistant United States Attorney Stein presented the testimony of Special Agent Zigler, including "extensive" testimony regarding the "KATHY HARRIS PERSONAL" file, to the Grand Jury and the indictment was promptly returned.

From the evidence presented the Court cannot find, by a preponderance, that the Assistant United States Attorney made no use of the information gleaned from the March 22, 1989 interview with Kathleen Harris. Of course, the prosecutor has subjectively advised that Mrs. Harris' cooperation and the resulting typewritten distillation of her interview were forgotten and not used by him.[15] The government's "heavy" burden is not discharged by the prosecutor's assertion that the immunized cooperation was not used. *See United States v. Tantalo*, 680 F.2d 903, 908 (2d Cir.1982). The Court casts no reflection upon the integrity or motives of the Assistant United States Attorney; nevertheless, there remains the inescapable conclusion that the interview with Kathleen Harris could not be wholly absent from the Assistant United States Attorney's mind during his preparation of this case. *See e.g., United States v. McDaniel*, 482 F.2d 305, 312 (8th Cir.1973).

The government requested additional time to enhance its earlier-made record and on November 13, 1991 presented the testimony of Steven Misko. Through Mr. Misko the government introduced its Exhibit 2,

the typewritten notes of Special Agent Jeffrey L. Troy, purportedly the summary of an interview which he conducted with Kathleen Harris on August 8, 1988 during the search of the Rubber Crafters Smithville facility. Specifically, the government directed the Court's attention to a portion of the sixth paragraph of the summary:

> In December of 1987, HARRIS began to keep a separate log of the testing at the Cairo facility. HARRIS kept her log in a ledger book entitled, "MK–6 Report from RWD Testing."

The government urges that as this log was discovered to be lodged in the "KATHY HARRIS PERSONAL" file, the government's ultimate discovery of the other contents of that file was "just a matter of time." The government has pointed to no basis in law for its "inevitable discovery rule" and the Court finds little persuasiveness in it.

The log which the government discovered in the "KATHY HARRIS PERSONAL" file was a 6 × 9 inch Federal Stenobook with "Kathy's 'Rwd' " handwritten at the top of its outside cover. Interestingly, the defendant has produced an 8½ × 11 inch 22–page xerox copy of documents which appear to be ledger-type paper and which are represented to be among the documents returned to the defendants by the government following the August 8, 1988 search, but not among those documents contained in the "KATHY HARRIS PERSONAL" file. Across the top of some of these documents is handwritten "MK–6 Tested in Rwd." It is not clear which, if either, of these exhibits is the same as that referenced in the agent's summary.

*Kastigar* compels an objective showing that the evidence presented against an accused does not flow directly or indirectly from the immunized cooperation of the accused. The person accorded immunity "is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authority." *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1665. Rather the prosecutor is charged with the responsibili-

---

**15.** The record does not reveal the date on which the prosecutor ultimately discovered his type-

written notes from the March 22, 1989 interview.

ty of presenting objective evidence from which the Court can find by a preponderance that the statements and testimony of the immunized witness have not been used against him in any respect.

Where it is apparent to the prosecutor early on that an immunized witness may subsequently be held to answer to related criminal charges, it is incumbent upon the prosecutor to employ appropriate objective measures to ensure that the subsequent prosecution is built upon a wholly independent footing. Moreover, where the prosecutor has in his file potentially incriminating information [16] which flows directly from the mouth of an immunized witness whom the government ultimately decides to prosecute, it is incumbent upon the prosecutor to take objective precautions to ensure that the integrity of the judicial process is protected. It is no legal answer for the prosecutor to assure the Court that he had forgotten about the interview with Mrs. Harris, that he was unaware of the document in his file, or that he had no present recollection of the events which brought it into existence at the time he prepared a final draft of the indictment or produced Special Agent Zigler before the Grand Jury with what the prosecutor termed to be the "smoking gun."

Accordingly, Counts 1, 2, 3, and 32 through 59 must be dismissed as to Kathleen Harris. With regard to Count 63, the Court does not believe that dismissal is appropriate; however, for reasons apparent to the Court, that charge must be severed from those remaining against various of the named codefendants. An appropriate contemporaneous order will be entered carrying forth these conclusions.

The Supreme Court ruled long ago that the Constitutional privilege against self-incrimination "relates to the past and does not endow a person who testifies with a license to commit perjury." *Glickstein v. United States*, 222 U.S. 139, 142, 32 S.Ct.

71, 73, 56 L.Ed. 128 (1911). The limitation remains applicable after the enactment of 18 U.S.C. § 6002. *See United States v. Housand*, 550 F.2d 818, 822 (2d Cir.) *cert. denied* 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977). *Kastigar*, which "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect," [17] compels no broader protection than that required to maintain the privilege. Moreover, this broad language from *Kastigar* does not prohibit the introduction of immunized statements, either truthful or false, for the purpose of establishing a perjury or false declaration offense. *United States v. Apfelbaum*, 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980). Accordingly, the immunity agreement in this case, which clearly provides no proscription against the government's prosecution of Mrs. Harris for perjury or false declaration, does not encroach upon Constitutional territory in this respect. Simply stated, Mrs. Harris' agreement with the government does not prohibit the charge preferred against her in Count 63 of the Indictment.

---

16. The Assistant United States Attorney testified that the March 22, 1989 interview produced "nothing inculpatory"; however, defense counsel suggests that in light of the government's theory of the case, it must view the "KATHY

HARRIS PERSONAL" file to contain inculpatory materials.

17. *Kastigar*, 406 U.S. at 454, 92 S.Ct. at 1661–62 (emphasis in the original).