**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Kathleen HARRIS, Defendant–Appellee.**

**No. 92–5022.**

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1992.

Decided Aug. 19, 1992.

Nina Swift Goodman, Criminal Div., U.S. Dept. of Justice, Washington, D.C., argued (William A. Kolibash, U.S. Atty., Michael D. Stein, Asst. U.S. Atty., Wheeling, W.Va., on brief), for plaintiff-appellant.

Dina Mattingly Mohler, Kay, Casto, Chaney, Love & Wise, Charleston, W.Va., argued, for defendant-appellee.

Before ERVIN, Chief Judge, and WIDENER and HAMILTON, Circuit Judges.

## OPINION

ERVIN, Chief Judge:

The government compelled Kathleen Harris, through a grant of use immunity, to testify about her role in Rubber Crafters, Inc.'s scheme to defraud the United States by supplying the Navy with defective lifeboats. The government then claimed that it independently discovered evidence that incriminated her in the scheme, and sought her indictment in the Northern District of West Virginia. The grand jury charged Harris with one count of conspiracy to defraud the United States by obtaining payment of false claims, in violation of 18 U.S.C. § 286; two counts of submission of false claims to the government, in violation of 18 U.S.C. § 287; 28 counts of mail fraud, in violation of 18 U.S.C. § 1341; and one count of perjury, in violation of 18 U.S.C. § 1623. Prior to trial, the district court dismissed all counts, with the exception of the perjury count, because it held that the government had not met its burden of showing that it discovered the evidence used against Harris independently of her immunized testimony, 780 F.Supp. 385. The government appeals this determination, and we affirm.

## I.

Pursuant to valid search warrants, government agents searched Rubber Crafters' West Virginia facilities on August 8, 1988 and seized some 96 boxes of documents. During its search, the government seized documents located in Harris' office. Harris has been employed by Rubber Crafters for the past sixteen years, most recently as Quality Control Manager, responsible for supervision of testing, inspection, and packing of Rubber Crafters products. While she watched, the government seized, from her briefcase, a manila file folder with "KATHY HARRIS PERSONAL" printed horizontally in large upper case blue letters across its cover.

On March 22, 1989, the government entered into a one-page immunity agreement with Harris by which the government promised, in exchange for her full and truthful cooperation, "Nothing contained in any statement or testimony given by you pursuant to this agreement or any evidence developed therefrom, will be used against you directly or indirectly in any criminal proceedings." J.A. 79.

On the same day and following execution of her immunity agreement, Harris was debriefed by Michael Stein, Assistant United States Attorney; Steven Misko, Special Agent at the Department of Defense, Office of the Inspector General, Defense Criminal Investigation Service (DCIS); and others in Pittsburgh, Pennsylvania at the DCIS offices. Stein memorialized the information in a five-page memorandum. Harris reviewed her employment history and responsibilities at Rubber Crafters and explained in detail the defective lifeboat scheme. The government purchased non-defective lifeboats, defined as those having

no more than 15 repairs, for the Navy. Rubber Crafters decided not to count what she termed prevulcanization repairs, and Harris' practice was to reevaluate boats with over 15 repairs to try to reduce the number of reported repairs. According to Stein's notes of the session, Harris stated:

[W]henever there were two or more repairs in an area covered by one hot iron mark (no matter how large, even if made with consecutive applications), she would assume that it was one repair, and subtract the other indicated repairs even though the repairs could have been made at different times, and her visual inspection would not be good enough to detect that. Kathy made new repair sheets whenever she found a repair on a boat that looked to her to have been made before vulcanization.

J.A. 191. Harris told the government agents that the incriminating evidence of her role in the scheme was to be found in the "Kathy Harris Personal" file. According to Stein's notes:

The new repair sheets were kept in a folder marked: "Kathy Harris personal". Also in this folder were kept three typed lists: (1) "MK–6 BOATS WITH 15 OR MORE REPAIRS", i.e. boats that were reevaluated and flunked because they still had more than 15 repairs; (2) "MK–6 BOATS OK'D AFTER EVALUATION OF REPAIRS", i.e. boats that had more than 15 repairs before reevaluation that were recounted to have less than 15 repairs and put back into production; and (3) "... EVALUATION NOT NECESSARY AS BOATS DO NOT EXCEED REQUIREMENT", i.e. boats that had less than 15 repairs (and needed no reevaluation).

*Id.* In addition, according to Stein's summary, Harris reported:

Boats that were reevaluated to have less than 15 repairs were put back into production ... accompanied by the new repair sheet that Kathy prepared. (The old one being maintained in the file that she maintained marked Kathy Harris personal.) (She thinks that the new repair sheet had a *copy* of the old repair sheet attached to it.)

*The decision to reevaluate* the number of repairs on boats with 15 or more repairs *was made* at a management meeting *somewhere between January and March of 1987.* The meeting was attended by Del Mossor, Anita, Eagle, Pete Zannoni, and Fred Jiles; minutes were taken by Anita, who probably typed them up herself. [Harris] did not implement the policy until she ran it by QAR Pieri and he approved it.

J.A. 191–92. The government brought a number of boxes to the interview and searched through them for the "Kathy Harris Personal" file so she could substantiate her story, but the government was unable to locate the file. Stein made a mental note that he wanted to review the file as a result of his interview with Harris. Sometime after the interview, Stein told Agent Misko that he was interested in the "Kathy Harris Personal" file. Misko sent him a few pages from the file that Stein now claims that he could not understand. Stein testified that he meant to ask Misko for the rest of the file, but that he never did so.

Almost two years elapsed before the government contacted Harris again, when Stein requested that she appear before a grand jury on February 27, 1991 pursuant to the immunity agreement. Before the appearance, Stein, along with Agent Ziegler, who had replaced Agent Misko on the case, debriefed Harris.

In May of 1991, Rubber Crafters filed a motion to require the government to return certain documents from the original search. This matter was to be heard at a May 23, 1991 hearing. At this hearing, Stein questioned Harris about the contents of the "Kathy Harris Personal" file. Stein alleges that he asked Agent Ziegler in preparation for the hearing to search through all the Rubber Crafters documents in the government's possession to look for the documents Rubber Crafters was requesting. The government contends that Ziegler found the "Kathy Harris Personal" file at that time. Ziegler states that he was impressed with the contents of the file and attempted to show them to Stein, but that

Stein was too busy before the hearing to look at them. At some time between the May 1991 hearing and August 5, 1991, Stein says he did review the contents of the file and found them to be "spectacularly damaging." J.A. 104. Ziegler testified below that Stein may have told him that he, Stein, already knew about the file.

On July 22, 1991, Stein, along with Agent Ziegler, debriefed Harris in preparation for her appearance before an August 14, 1991 grand jury pursuant to the immunity grant. On August 5, 1991, however, the government rescinded its plea agreement because, Stein alleged, Harris had never been truthful with the government from the beginning of the agreement and Stein had recently become aware from documentary evidence (the file) that she was a "major player" in the conspiracy to defraud. J.A. 316. The "Kathy Harris Personal" file constituted the sum total of the "new" evidence against Harris, and the contents of this file corresponded fully with Harris' March 22, 1989 description of it.

Stein successfully sought Harris' indictment before the grand jury on August 16, 1991 solely through information contained in the file. Pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), Harris moved for the dismissal of her indictment. Following a *Kastigar* hearing on October 10, 1991, the district court dismissed all counts against Harris, with the exception of a perjury count. The court reasoned in its December 12, 1991 memorandum opinion that the government's use of the "Kathy Harris Personal" file to secure Harris' indictment violated her Fifth Amendment rights against self-incrimination.[1] The government appeals the dismissal.

## II.

■ The agreement between Harris and the government in this case operated as use and derivative use immunity for compelled testimony. The Supreme Court in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), ap- proved the government's grant of "use" immunity under 18 U.S.C. § 6002 to compel a witness' self-incriminating testimony. Because the government, under the statute, cannot use the immunized testimony or any evidence derived from it either directly or indirectly, the Court held that use immunity is "coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." *Id.* at 453, 92 S.Ct. at 1661. The Court in *Kastigar* distinguished between use and the broader concept of transactional immunity. Transactional immunity protects an individual against prosecution for anything concerning the substance of compelled testimony. Use immunity, on the other hand, only protects against the government's use of compulsory testimony as a source of evidence, leaving the government free to use any other evidence to prosecute. *See United States v. Lipkis*, 770 F.2d 1447, 1450 (9th Cir.1985).

■ When the government decides to prosecute a previously use-immunized witness, the district court must hold a so-called *Kastigar* hearing to allow the government the opportunity to demonstrate that all its evidence came from sources independent of the compelled testimony. The government bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar*, 406 U.S. at 461–62, 92 S.Ct. at 1665 (footnote omitted). Courts have interpreted this passage to require the government to make its proof by a preponderance of the evidence. *See, e.g., United States v. North*, 910 F.2d 843, 854, *modified in part*, 920 F.2d 940 (D.C.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). It is not legitimate for the government to alter its investigatory strategy as a result of the immunized statement. As the Court stated in *Kastigar*, "This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and

---

1. According to the Fifth Amendment to the United States Constitution, "No person ... shall be compelled in any criminal case to be a witness against himself...."

also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." 406 U.S. at 460, 92 S.Ct. at 1664 (footnote omitted).[2] The district court must make specific findings on the independent nature of the allegedly untainted evidence. *See United States v. Rinaldi,* 808 F.2d 1579, 1584 (D.C.Cir.1987). When the court uses correct legal principles, its taint determination is a factual finding subject to review under the clearly erroneous standard. *United States v. Jones,* 542 F.2d 186, 199 (4th Cir.1976), *cert.* denied, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976).

Although the government argued vigorously below and before us that Stein's previous exposure to Harris' testimony had no bearing on Ziegler's discovery of the incriminating documents and Stein's subsequent use of them against Harris, the government's mere representations to this effect standing alone are generally insufficient to carry its burden. *See United States v. Byrd,* 765 F.2d 1524, 1529 (11th Cir.1985); *United States v. Tantalo,* 680 F.2d 903, 908 (2d Cir.1982); *United States v. Seiffert,* 463 F.2d 1089, 1092 (5th Cir. 1972). The court had only the government's representations as evidence as to whether the government met its "heavy burden" because, as the court below emphasized, the government failed to take any precautions to protect Harris from ill effects of her compelled statement (except for the fortuity that Misko quit government service and Ziegler became the agent on the case). *See* J.A. 327–28. The usual precautions, not followed in this case, are for the government to insulate a prosecutor and/or investigator who is familiar with the immunized statement from subsequent prosecution of the compelled witness or to seal the incriminating documents.

As the Eleventh Circuit has stated, "Unless the government relies solely upon evidence obtained prior to the immunized testimony, the principles of *Kastigar* generally require (as a practical matter) a showing that prosecuting officials and their agents were aware of the immunity problem and followed reliable procedures for segregating the immunized testimony and its fruits from officials pursuing any subsequent investigations." *United States v. Hampton,* 775 F.2d 1479, 1490 (11th Cir.1985). As the government acknowledged at oral argument, the Department of Justice recognizes this problem by recommending that prosecution of a compelled witness be handled by an attorney unfamiliar with the substance of the compelled testimony. *See* United States Attorneys' Manual, § 1–11.-400 (cited in *United States v. Crowson,* 828 F.2d 1427, 1429 (9th Cir.1987), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988)). It is true that courts have generally declined to erect a *per se* rule requiring withdrawal of a prosecutor or other government official who may have been exposed to immunized testimony, and we do not erect such a rule here. *See Crowson,* 828 F.2d at 1430; *United States v. Pantone,* 634 F.2d 716, 720 (3d Cir.1980). However, a prosecutor's failure to withdraw certainly makes it more difficult for the government to prove that the compelled testimony did not contribute to the prosecution.

In this case, the court below determined that the government did not meet its burden. According to the court, "From the evidence presented the Court cannot find, by a preponderance, that the Assistant United States Attorney made no use of the

---

**2.** The circuits are divided as to whether *Kastigar* permits what has broadly been termed "the non-evidentiary use of immunized testimony" in criminal cases. *See North,* 910 F.2d at 856–60 (discussing cases and reserving question). Non-evidentiary uses are those "that do not furnish a link in the chain of evidence against the defendant." Humble, *Nonevidentiary Use of Compelled Testimony: Beyond the Fifth Amendment,* 66 Tex.L.Rev. 351, 355–56 (1987). However, in our view, use of compelled testimony as an

"investigatory lead" to obtain or explicate evidence that is subsequently used against the immunized witness is an evidentiary use of the testimony. *But see United States v. Serrano,* 870 F.2d 1, 16–17 (1st Cir.1989) (considering assistance in focusing the investigation and interpreting evidence as non-evidentiary use, but declining to decide whether such use would be proper). We need not decide whether non-evidentiary use is permissible in this case.

information gleaned from the March 22, 1989 interview with Kathleen Harris." J.A. 325. Support in the record to sustain the finding that the government failed to meet its burden lies in the fact that the government still has been unable to eliminate the significant possibility that it used Harris' compelled testimony as an "investigatory lead." *See Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664. Specifically, there are several links in the chain of the government's story made weak from its lack of insulating procedures. Stein's knowledge of Harris' testimony may have played some part in his request of Ziegler to search through all the Rubber Crafters files. Alternatively, even if Stein legitimately asked Ziegler to look through the documents in anticipation of the May 1991 hearing, Stein may have transferred his knowledge to Ziegler in some manner so that he would be more likely to find the "Kathy Harris Personal" file and turn it over to Stein. Finally, the possibility remained that Stein imparted enough of his knowledge to Ziegler to make it possible for Ziegler to understand, and therefore for the government to use, the file once Ziegler did come across it. The district court's determination that the government obtained Harris' indictment through evidence tainted by her compelled testimony is based on findings that are not clearly erroneous: Stein took no precautionary measures, Stein did not forget Harris' testimony, and the government did not prove that it did not use the immunized evidence. We therefore cannot disturb the district court's disposition of this case.

The government seizes on the district court's finding that Stein did not forget Harris' testimony to argue that the court failed to distinguish between use and transactional immunity by making it impossible to show that it used untainted evidence to indict Harris. *See United States v. Serra-*

*no,* 870 F.2d 1, 17–18 (1st Cir.1989). The district court stated that "the interview with Kathleen Harris could not be wholly absent from the Assistant United States Attorney's mind during his preparation of this case." J.A. 325. We agree with the government that "[t]he focus of the inquiry under *Kastigar* ... is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant." *United States v. Caporale,* 806 F.2d 1487, 1518 (11th Cir.1986), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). However, as we have shown, the court determined that the government did not meet its burden of proving that it did not use the immunized testimony to build the case against Harris; thus the government's criticism is off the mark.[3]

■ The government is correct that dismissal of the indictment is not necessary when the use of the compelled testimony is harmless beyond a reasonable doubt. *See United States v. Serrano,* 870 F.2d 1, 16 (1st Cir.1989). However, harmless error analysis is of no help to the government here. As the district court determined, the government failed to demonstrate that it did not directly or indirectly use Harris' statements to obtain or explicate the incriminating file, and, as the government concedes, there is no evidence beyond this file that can be used against Harris. Harris' indictment, excluding the separate count of perjury, must therefore be dismissed.

AFFIRMED.

---

**3.** We also decline the government's invitation to read the court's statement that it "casts no reflection upon the integrity or motives of the Assistant United States Attorney" to constitute a finding that the court entirely accepted the government's version of its actions in this case. J.A. 325. In the context of the court's broader discussion about the lack of government precautions, its finding that Stein could not have for-

gotten about the substance of Harris' statement, and its finding that Stein did not show that he did not use that testimony in obtaining the indictment, we consider the court's statement to be merely an attempt to phrase its ruling in a delicate manner. If the court entirely accepted the government's account, it would have said so clearly and it would not have quashed the indictment.