PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 13-4108

———————————

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

CHARLES ROBERT BAREFOOT, JR.,

        Defendant - Appellant.

———————————

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.   Terrence W. Boyle, District Judge.   (5:05-cr-00166-BO-1)

———————————

Argued: March 20, 2014            Decided: June 9, 2014

———————————

Before WILKINSON, KING, and FLOYD, Circuit Judges.

———————————

Affirmed in part, reversed in part, and remanded with instructions by published opinion.   Judge King wrote the opinion, in which Judge Wilkinson and Judge Floyd joined.

———————————

**ARGUED:** Joseph Edward Zeszotarski, Jr., GAMMON, HOWARD, ZESZOTARSKI, PLLC, Raleigh, North Carolina, for Appellant.   Seth Morgan Wood, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.   **ON BRIEF:** Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, Kristine L. Fritz, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

———————————

KING, Circuit Judge:

Charles Robert Barefoot, Jr., appeals the February 6, 2013 judgment of conviction entered against him by the district court, in conformance with the jury's verdict, on all six counts of a 2006 Superseding Indictment stemming from several instances of criminal conduct that Barefoot was accused of undertaking between October 2001 and June 2002. Barefoot also appeals the 180-month sentence of imprisonment imposed by the court on his various convictions. As described in particular below, we affirm Barefoot's convictions on Counts One through Four of the Superseding Indictment, but we reverse his convictions on Counts Five and Six. Nevertheless, because the latter two convictions did not materially affect his sentence — which was otherwise properly calculated — we do not remand for Barefoot to be resentenced.

I.

A.

Acting on information supplied by a confidential informant to the Bureau of Alcohol, Tobacco and Firearms (the "ATF"), a deputy of the Johnston County, North Carolina Sheriff's Department stopped Barefoot's van in traffic during the morning of July 19, 2002. The deputy searched the van with Barefoot's

consent, finding two loaded semiautomatic handguns beneath the driver's seat.

Not quite two hours later, the ATF executed a search warrant at Barefoot's residence, where they discovered component materials for explosives, Ku Klux Klan clothing and propaganda, and twenty-five firearms (predominantly shotguns and rifles) in proximity to more than four thousand rounds of ammunition. A concurrent search of the house where Barefoot's son, Daniel, lived with several others, turned up two Kinestik binary explosive cartridges wrapped in newspaper and stored in a freezer. Daniel, eighteen years old and a Klansman in his father's group, told federal agents that Barefoot had given him the explosives, which other residents referred to as "liquid dynamite."

On August 20, 2002, Barefoot was indicted in the Eastern District of North Carolina on a single count of possessing a firearm while subject to a domestic violence restraining order, in violation of 18 U.S.C. § 922(g)(8). The predicate order was entered in state court in Johnston County after the presiding judge found that Barefoot, on March 15, 2002, had held a 9mm pistol to the head of his wife, Sharon, and threatened to kill her. Barefoot pleaded guilty to the federal indictment pursuant to an agreement with the government by and through the United States Attorney for the Eastern District of North Carolina

3

(referred to in the agreement as the "USA-EDNC"). Paragraph 4 thereof provided, in pertinent part:

The Government agrees:

* * * *

c. That the USA-EDNC will not further prosecute the Defendant for conduct constituting the basis for the Indictment; [and]

* * * *

f. That the USA-EDNC agrees not to use any information provided by the Defendant pursuant to this agreement to prosecute him for additional crimes, except for crimes of violence[.]

Memorandum of Plea Agreement, United States v. Barefoot, No. 5:02-cr-00219-01 (E.D.N.C. Jan. 21, 2003), ECF No. 39 (the "Plea Agreement" or the "Agreement").[1]

The "information provided by the Defendant" specified in Paragraph 4.f referred to Barefoot's obligation to "disclose fully and truthfully in interviews with Government agents, information concerning all conduct related to the Indictment and any other crimes of which the Defendant has knowledge." Plea Agreement ¶ 2.h. As the result of their inquiry into Barefoot's activities, the ATF and FBI had come to suspect him of a number of crimes. Eyewitnesses had reported Barefoot in possession of

_____

[1] The Plea Agreement is found at J.A. 57-64. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.)

4

a thirty-pound homemade bomb, and the agents were informed that local authorities had investigated Barefoot for alleged threats against the Sheriff's Department and other law enforcement agencies.

The district court accepted Barefoot's guilty plea at a hearing on January 21, 2003, after which the debriefing mandated by the Plea Agreement took place. There, Barefoot admitted having obtained the Kinestik cartridges in exchange for a hunting dog. Barefoot also recounted a meeting with Glen Gautier, Michael Brewer, and Mark Denning. The men had convened at Barefoot's home one evening during the late summer of 2001 to discuss a "problem" with Lawrence Petit, a fellow Klansman in coastal Carteret County, North Carolina, whom Brewer had branded an informant. J.A. 70.

After considerable deliberation, the group resolved to have Petit moved inland to Robeson County, or, failing that, to "get rid of him." J.A. 71. Barefoot permitted the others to use his van, and he lent Gautier two firearms. The trio returned a few hours later to inform Barefoot that Denning had shot and killed Petit, with the corpse having been buried in a hayfield belonging to Gautier's brother. Gautier handed Petit's wallet to Barefoot as proof of death; Barefoot destroyed it with a blowtorch. At the time of Barefoot's interview, Gautier and

Denning had been arrested and charged with the murder, and Brewer was about to be.

Barefoot unequivocally denied having made any bombs, and he omitted all mention of a series of incidents in October 2001, which began when Daniel and two Klan associates — Jonathan Avery and Jonathan Maynard — stole more than thirty firearms from an outbuilding. The three thieves took their haul to Barefoot's residence, where Barefoot, Sharon, and Gautier assisted in wiping down the weapons to remove any fingerprints. The next day, Barefoot and Gautier transported some of the firearms to an area barn for safekeeping, and about ten or fifteen ultimately made their way to Brewer for sale on consignment.

On June 18, 2003, the district court sentenced Barefoot to 27 months in prison for his § 922(g)(8) conviction, granting him credit for time served since his July 2002 arrest. Upon his release from federal imprisonment on October 18, 2004, Barefoot was charged and detained by state authorities in connection with the Petit murder.

B.

While in state custody, Barefoot was again indicted by the grand jury in the Eastern District of North Carolina. The operative Superseding Indictment, filed August 2, 2006, charged Barefoot in Count One with conspiracy to receive, possess, conceal, store, barter, sell, and dispose of stolen firearms,

6

see 18 U.S.C. §§ 371, 922(j); in Count Two with the substantive § 922(j) offense; in Count Three with solicitation of another to assist in damaging and destroying by explosive the Johnston County Courthouse and Sheriff's Office, part of which was leased to the United States Department of Veterans Affairs, see id. §§ 373(a), 844(f)(1), 844(i); in Count Four with receiving an explosive (the Kinestik cartridges) with the intent that it be used to kill, injure, or intimidate other persons and to damage and destroy buildings, see id. § 844(d); in Count Five with a misdemeanor charge of improperly storing explosive materials, see id. §§ 842(j), 844(b); and in Count Six with distributing explosive materials to an individual (Daniel) under twenty-one years of age, see id. § 842(d)(1).

At the outset of a motions hearing on February 14, 2007, defense counsel apprised the district court that the judge in the state murder proceedings had expressed concern over Barefoot's mental condition. Counsel had thus elected to retain the services of a psychiatrist, who, after evaluating Barefoot, opined that he was not competent to stand trial. Based on the representations before it and on its own observations of Barefoot's demeanor, the court directed that he be delivered to the custody of the Attorney General for examination. See 18 U.S.C. § 4241(b).

7

During a hearing on November 14, 2007, the district court reviewed the report of the government's mental health professionals, who diagnosed Barefoot as suffering from delusional disorder, mixed type (persecutory and grandiose delusions), and from personality disorder, NOS (antisocial traits). In accordance with the recommendation set forth in the report, the court found Barefoot incompetent, and it recommitted him to the Attorney General to determine his prospects for improvement. See 18 U.S.C. § 4241(d). As a collateral consequence of the court's finding, the state court murder charge was dismissed on December 6, 2007, subject to reinstatement.

On November 26, 2008, the district court convened another hearing to decide whether Barefoot should be involuntarily medicated in an attempt to restore his competency. Barefoot appealed from the court's ruling in the affirmative, and, on February 9, 2010, we vacated that ruling and remanded for further consideration in light of our decision in United States v. Bush, 585 F.3d 806 (4th Cir. 2009). Before the medication question could be resolved on remand, however, Barefoot's condition was determined to have spontaneously partially remitted. On March 15, 2011, without objection, the court found that Barefoot had regained his competency to stand trial and ruled that the case could proceed.

Prior to Barefoot's competency having come into question, he had moved the district court to dismiss the indictment as violative of the Plea Agreement, and to suppress the statements he made during his January 21, 2003 debriefing. The court conducted a hearing on those motions on May 18, 2011, and, by its order filed August 22, 2011, denied them. Barefoot's counsel moved for reconsideration on February 21, 2012, and then, on March 8, 2012, Barefoot filed a pro se motion to represent himself at trial. See Faretta v. California, 422 U.S. 806, 832 (1975) (recognizing criminal defendant's Sixth Amendment right to self-representation). The parties appeared on March 29, 2012, to be heard on the latter motion, which the court denied by its memorandum order of April 3, 2012. See United States v. Barefoot, No. 5:05-cr-00166 (E.D.N.C. Apr. 3, 2012), ECF No. 257 (the "Faretta Order").[2] By separate order entered that same day, the reconsidered motion to suppress was denied as moot after the government agreed not to use the debriefing statements at trial.

On September 18, 2012, within a week of trial, Barefoot moved the district court in limine to exclude any evidence concerning his involvement in the Petit murder (the "Petit evidence"). The government had previously given notice,

_____

[2] The Faretta Order is found at J.A. 468-72.

9

pursuant to Federal Rule of Evidence 404(b), of its intent to introduce the Petit evidence, as well as evidence of Barefoot's bomb-making, of his threats against the Johnston County Sheriff and others, and of his Klan activities. Trial commenced on September 24, 2012, with the jury being empaneled and then excused. The parties remained in the courtroom for a hearing on the motion in limine, which the court denied. The trial resumed and concluded the following day, with the jury finding Barefoot guilty of all six counts.

The district court, on February 6, 2013, entered judgment on the jury's verdict, sentencing Barefoot to 60 months in prison on Count One; to a consecutive term of 120 months on Counts Two, Three, Four, and Six, running concurrently with each other; and to 12 months on Count Five, to be served at the same time as the cumulative 180-month term. By timely notice filed February 11, 2013, Barefoot appeals.


II.

Barefoot maintains that his trial and sentencing was riddled with legal infirmities. He assigns specific error to the district court's rulings: (1) denying his motion to represent himself; (2) denying his motion in limine to exclude the Petit evidence; (3) declaring the government's evidence sufficient to sustain his convictions on Counts Three and Four,

10

thus leading to the denial of his motions for judgments of acquittal on those charges; (4) denying his motion to dismiss Counts Four through Six as having been brought in violation of the Plea Agreement; and (5) overruling his objections to the manner in which his sentence was calculated pursuant to the Sentencing Guidelines.[3]

In order to accurately determine whether the accused may competently exercise his constitutional right to defend himself, "realistic account of the particular defendant's mental capacities" must be taken. Indiana v. Edwards, 554 U.S. 164, 177 (2008). As a practical matter, "the trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." Id. We therefore will not disturb, absent a palpable abuse, the district court's exercise of discretion in that regard.[4] The same abuse-of-discretion

---

[3] Though represented by counsel, Barefoot himself has submitted for our review a pair of supplemental briefs appended with various exhibits. On February 7, 2014, we entered an order accepting the supplemental briefs for filing, and, in resolving this appeal, we have fully considered them and the exhibits attached thereto.

[4] Once trial has begun under the stewardship of counsel, the necessity that it proceed efficiently, without inconvenience, delay, or confusion of the jury, affords the district court in the exercise of its supervisory role an alternative source of discretion to refuse a request from a defendant — even an indisputably competent one — to proceed pro se. See United
(Continued)

11

standard governs our review of the court's decision to admit evidence of crimes and other "bad acts" pursuant to Federal Rule of Evidence 404(b).  See United States v. Day, 700 F.3d 713, 728 (4th Cir. 2012).

By way of contrast, we conduct a de novo review of the district court's evaluation of the sufficiency of the evidence supporting Barefoot's convictions.  See United States v. Abdulwahab, 715 F.3d 521, 528 (4th Cir. 2013).  Though we examine the trial record unencumbered by the ruling below, we must nonetheless "view the evidence in the light most favorable to the government and sustain the jury's verdict if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt."  Id. at 528-29 (internal quotation marks omitted).

We also review de novo the district court's application of the Plea Agreement and the Guidelines, at least insofar as questions of law predominate.  See United States v. West, 2 F.3d 66, 69 (4th Cir. 1993) (specifying de novo review insofar as enforcement of plea agreement "turns on contract principles concerning the interpretation of unambiguous [provisions] or

_____

States v. Singleton, 107 F.3d 1091, 1096-97 (4th Cir. 1997) (citing, inter alia, Bassette v. Thompson, 915 F.2d 932, 941 (4th Cir. 1990)).

12

other matters of law"); <u>United States v. Manigan</u>, 592 F.3d 621, 626 (4th Cir. 2010) (instructing that court's legal conclusions attendant to imposition of Guidelines sentence are reviewed de novo).  To the extent, however, that the court's rulings depended on its resolution of one or more facts in dispute, our review is for clear error.  See <u>West</u>, 2 F.3d at 69; <u>Manigan</u>, 592 F.3d at 626.

III.

A.

The Supreme Court has disavowed "the use of a single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself."  <u>Indiana v. Edwards</u>, 554 U.S. 164, 175 (2008).  The <u>Edwards</u> Court observed, "In certain instances an individual may well be able to . . . work with counsel at trial, yet at the same time he may unable to carry out the basic tasks needed to present his own defense."  <u>Id.</u>  Barefoot, according to the district court, fell within that category of defendants contemplated by <u>Edwards</u>.  The question before us is whether the court's determination was sufficiently supported and reasoned to qualify as an appropriate exercise of its discretion.

13

The district court had ample opportunity at the hearing on Barefoot's motion to converse with him and to perceive his capabilities and comportment. See United States v. Bernard, 708 F.3d 583, 591 (4th Cir. 2013) (explaining that "the district court was in the best position to observe [the defendant's] demeanor and make judgments about his mental abilities"). The court based its decision in substantial part on its "impressions of and discussions" with Barefoot during the hearing. Faretta Order 5. These colloquies were generally marked by Barefoot's insistence that he could cross-examine the government's witnesses far more ably than his appointed counsel. The court strove to impress upon Barefoot that effective cross-examination is merely an isolated aspect of a thorough, competent defense, but it came to regard that message as neither received nor comprehended. At hearing's end, the court remained "unconvinced" that Barefoot could "understand[] fully his role and duties at trial were he to represent himself." Id. at 4.[5]

---

[5] The district court doubtlessly was also aware that Barefoot, upon being adjudicated competent to stand trial, proceeded to file with the clerk about a dozen pro se motions, letters, memoranda, and the like during the months leading up to the hearing. Barefoot relentlessly papered the record notwithstanding that he was represented by counsel, and despite the court's standing order that his pro se submissions would be terminated as a matter of course with no response required from the government. Barefoot's conduct could hardly have afforded the court much confidence that he would heed its instructions and otherwise comply with the normal strictures of trial.

Moreover, the district court expressed concern that Barefoot's delusional disorder had only partially remitted, and that he was not taking medication to ameliorate any lingering impairment. The court adverted to the forensic evaluation prepared by Ralph Newman, a staff psychiatrist at the Federal Medical Center in Butner, North Carolina, where Barefoot had been housed since January 2008. Dr. Newman's evaluation was prepared on March 9, 2011, then submitted to the court to support the proposition that Barefoot had regained sufficient competency to be tried. Dr. Newman concluded that "Barefoot is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense. We view him as competent to stand trial <u>with representation by his attorney</u>." J.A. 905 (emphasis added).

Barefoot maintains that the district court, in determining whether he was able to adequately represent himself in April 2012, could not have reasonably relied on Dr. Newman's opinion given more than a year previously. But Barefoot offered no evidence of his own in counterpoint. Further, Barefoot's mental health had been at issue before the court, at the time of its ruling, for more than five years. Viewed in the context of the process at large — deliberate as it was — the court correctly declined to disregard Dr. Newman's evaluation as stale per se.

Rather, the district court was bound to consider all of the evidence together with any circumstances enhancing or detracting from its probative value, including its vintage, and to accord that evidence its commensurate weight. Dr. Newman's 2011 evaluation, standing in isolation, might have been regarded as inconclusive with respect to Barefoot's competency to conduct his own defense in 2012. Taken in conjunction with the court's opportunity to personally observe Barefoot, however, and juxtaposed with the affirmative evidence of Barefoot's competency (of which there was little), Dr. Newman's opinion could rationally carry the day. It was therefore not an abuse of the court's discretion to rule, in accordance with Edwards, that Barefoot was not sufficiently competent to represent himself at trial.

## B.

The government offered the Petit evidence in connection with its presentation on Count Three, which charged Barefoot with solicitation to commit a crime of violence, that is, to damage or destroy by explosives the Johnston County Courthouse and Sheriff's Office. Gautier, who had participated in Petit's murder, recounted at trial that Barefoot harbored a grudge against Sheriff Bizzell. Barefoot blamed Bizzell for the failure of the Barefoots' fledgling drinking establishment, The Enchanted Barn, which one witness described as "a backwoods

16

bootleg bar or something." J.A. 663. Gautier explained that Barefoot "was trying to get a liquor license and Bizzell held him off on it, stalled it . . . . Then when he did get . . . his license, Bizzell raided the place and pretty much put a damper on all of it." Id. at 600. Subsequently, Bizzell denied Barefoot's Klan group a permit to march in a local parade, which served to fuel Barefoot's hatred. See id. at 661.

According to Gautier, Barefoot spoke "several times" of "getting back" at Sheriff Bizzell by "blowing the courthouse up." J.A. 599-600. Gautier elaborated on one specific conversation along those lines that took place during the autumn of 2001:

> Q. Did Mr. Barefoot approach you at some point with an idea about blowing up the courthouse?
>
> A. That was before [Barefoot's acquisition of the liquid dynamite]. He mentioned something about what he planned on doing at the courthouse. He mentioned floating down the river at night in a light canoe or a one man boat or whatever and one man could . . . get out, plant the stuff, somebody could drop him off upriver, he could float down, do what he had to do at the courthouse, said he would drop off explosives. And then somebody could pick him up south — the river ran right [past] the courthouse is what I understand.
>
> Q. Now, was he asking you to do anything like this?
>
> A. I think that was in his mind, but he didn't come out and just ask me to do it. He said that's what he had in mind and wanted to find somebody to do it.

* * * *

17

Q. Did Mr. Barefoot, in fact, have any kind of raft or —

A. He had a one-man boat.

Q. He did have a one-man boat. In your mind did you understand him to be serious when he was talking about this?

A. Yes. I'm pretty sure he was serious.

Id. at 601-02.

To be sure, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Evidence of crimes, wrongs, or bad acts, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. 404(b)(2). We have observed generally that "Rule 404(b) is a rule of inclusion, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." See, e.g., United States v. Moore, 709 F.3d 287, 295 (4th Cir. 2013) (internal quotation marks omitted).

In particular, there are four prerequisites to fulfill before Rule 404(b) evidence can be admitted in a criminal proceeding. The evidence must be: (1) relevant to an issue other than the defendant's general character; (2) probative

18

enough of an essential claim or element of the offense as to prove necessary to the government's case; (3) reliable; and (4) not so provocative "that it tends to subordinate reason to emotion in the factfinding process." See United States v. Williams, 740 F.3d 308, 314 (4th Cir. 2014) (incorporating with respect to fourth factor Rule 403 requirement that probative value of evidence not be substantially outweighed by prospect of confusing factfinder or unfairly prejudicing defendant).

At closing argument, defense counsel sought to downplay his client's approach of Gautier as insubstantial and fanciful talk, reminding the jury that witnesses had described Barefoot as "a nut" and "a braggart." J.A. 794. On appeal, Barefoot maintains that "copious evidence" indicated he "talked about many things that never occurred." Br. of Appellant 30. Barefoot's efforts to portray his words as little more than idle musings illustrate why the Petit evidence was admissible. The discussion among Barefoot, Gautier, and the other Klansmen that directly led to Petit's murder demonstrated to the jury that these were not merely men who talk, but men who act — however despicable those acts may be.

The Petit evidence was thus relevant to show that Barefoot was devising a serious scheme to blow up the courthouse, thereby demonstrating his culpable intent in soliciting Gautier's assistance. Cf. United States v. Cvijanovich, 556 F.3d 857,

19

864 (8th Cir. 2009) (concluding, in prosecution for threatening President, that evidence of prior similar conduct was relevant to illustrate defendant's "intent and the seriousness of the threats"). Beyond mere relevance, however, the evidence was necessary to the government's case inasmuch as the sincerity of Barefoot's overture to Gautier was an essential element of the solicitation offense. See infra Part III.C.1.a.

The jury, of course, was entitled to credit Gautier's testimony at face value and to regard his impressions as credible insofar as the details of the proposal dovetailed with Barefoot's access to a boat and eventual procurement of explosives. Nonetheless, the additional evidence of the duo's earlier involvement in plotting Petit's violent demise — such plot being successfully executed — powerfully corroborated Gautier's reckoning that he had accurately perceived Barefoot's meaning during their subsequent discussion concerning the Johnston County Courthouse.

It is difficult to imagine evidence more inimical to the jury's perception of a defendant than that of participation in a murder. See United States v. Lighty, 616 F.3d 321, 357 (4th Cir. 2010) (acknowledging that "admission of evidence of an uncharged murder is extremely prejudicial"). Rule 403, however, does not require the exclusion of Rule 404(b) murder evidence in all circumstances. See, e.g., United States v. Myers, 280 F.3d

20

407, 413-14 (4th Cir. 2002) (ruling that evidence of defendant drug dealer's fatal shooting of customer was substantially probative of firearm charges, and, although "damaging," was not unfairly prejudicial); United States v. Melton, 970 F.2d 1328, 1336 (4th Cir. 1992) (reasoning that trial court did not err by striking Rule 403 balance in favor of admitting evidence of defendant's uncharged murder of informant in furtherance of charged drug conspiracy). We have recognized, moreover, that instructions to the jury limiting its consideration of Rule 404(b) evidence serve to blunt its prejudicial effect. See United States v. Wilson, 624 F.3d 640, 655 (4th Cir. 2010).

When the subject of the murder investigation was initially broached with the government's first witness — an ATF agent — the district court immediately interrupted the questioning to inform the jury that the Petit evidence was "not offered to prove that [Barefoot] is a bad person or that he's a person of bad character," pointedly instructing the jurors that they were "not to allow it to prejudice you about the crimes that are on trial in this case." J.A. 549. Later on, when Brewer began to offer his eyewitness account of the murder, the court reiterated its warnings. See id. at 685-86.

We can only conclude that the district court exercised the utmost care to attenuate the harm to Barefoot in the jury's eyes that may have resulted when witnesses implicated him in Lawrence

21

Petit's murder. We likewise consider that the Petit evidence was crucial to the government's proof of Count Three, insofar as it established the dynamic between Barefoot and Gautier in an analogous situation and thereby lent credence to the latter's testimony. Under those circumstances, we cannot say that the district court abused its discretion in admitting the Petit evidence after determining that its probative value was not substantially outweighed by the risk of unfair prejudice.

C.

1.

The foregoing discussion of the Rule 404(b) evidence portends, perhaps, our disposition of Barefoot's challenge to the sufficiency of the evidence on which the jury convicted him of Count Three. The offense charged therein prescribes fines and imprisonment for anyone who "solicits, commands, induces, or otherwise endeavors to persuade" someone else, intending that the other "engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States and under circumstances strongly corroborative of that intent." 18 U.S.C. § 373(a).

From the statutory language, we derive the essential elements of § 373(a) as: (1) a solicitation, command, or

22

similar entreaty; (2) to commit a federal felony; (3) involving the actual or inchoate use of force against person or property; (4) made under such conditions or within such context that the overture may reasonably be regarded as sincere. With respect to the sincerity element, the court of appeals in United States v. Buckalew explained that § 373(a) "'is designed to cover any situation where a person seriously seeks to persuade another person to engage in criminal conduct.'" 859 F.2d 1052, 1054 (1st Cir. 1988) (quoting S. Rep. No. 97-307, 97th Cong., 1st Sess. 183-84 (1982)).

Count Three of the indictment alleged two federal felonies as the subjects of the solicitation, each set forth in § 844 of the criminal code. The first prohibits the malicious damage or destruction by fire or explosive of, inter alia, "any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States." 18 U.S.C. § 844(f)(1). The second proscribes the same conduct directed at any property "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." Id. § 844(i). Both offenses unquestionably involve the use of force against property. Likewise, there is no dispute that the government leased and possessed a portion of the Johnston County Courthouse, and that at least part of the premises were used in some activity affecting commerce.

23

a.

Barefoot confronts head-on the government's proof of the threshold solicitation requirement.  Reprising the trial account of the plan for blowing up the courthouse, Barefoot emphasizes Gautier's acknowledgment that he [Barefoot] "didn't come out and just ask [Gautier] to do it."  J.A. 601.  We are unable to agree that § 373(a) should be construed so narrowly as to exclude from its coverage all but the most overt solicitations.  Moreover, Barefoot's distillation of Gautier's testimony to a single excerpt disserves the broader meaning attributable to its entirety.

Certainly, a straightforward request or directive fulfills the first element of § 373(a) by constituting an unambiguous solicitation or a command.  The element is also satisfied, however, by inducement and — least stringently — by an "endeavor to persuade."  In everyday contexts, an endeavor to persuade may entail all sorts of communication strategies, verbal and non-verbal.  Without question, we humans develop an impressive array of techniques for influencing others.  We may favor a friend with a wink and a nod, discreetly thrust a banknote into the willing palm of a maître d'hôtel, or even say nothing where something is expected in the hope that our silence will foment distress and, ultimately, acquiescence.

24

Hence, Barefoot's apparent reluctance to "come out and just ask" Gautier to help him blow up the courthouse is not dispositive of the issue. Gautier testified additionally that he was "pretty sure" that the plan was serious, J.A. 602, and that Barefoot desired "somebody" to assist him with it, id. at 601. Although Gautier could hardly convey Barefoot's inflections, intonations, and nonverbal cues, there is a compelling inference to be taken even from the stark transcript that Barefoot would not have described his plan in such gratuitous detail had he not hoped that Gautier might be that "somebody." Giving the government the benefit of this inference and of Gautier's overall impression of the conversation, there was sufficient evidence for the jury to find that Barefoot endeavored to persuade Gautier to help him blow up the Johnston County Courthouse.

### b.

Barefoot's attack on the sufficiency of the evidence in support of the federal felony element is considerably more subtle. Barefoot maintains that he should not have been convicted of violating § 373(a) because the government's evidence, even if fully credited, revealed that he solicited Gautier's felonious involvement not for the use of force against the courthouse, but merely to provide transportation before and after Barefoot himself had used such force.

Barefoot's deconstruction of the courthouse scheme into its component parts are unavailing, inasmuch as his efforts in that regard misconstrue the law and inadequately account for our precedent. Had Barefoot's plan come to fruition as designed, Gautier would have aided and abetted the damage or destruction by explosive of the Johnston County Courthouse. Aiding and abetting is not itself a federal offense, but merely "describes the way in which a defendant's conduct resulted in the violation of a particular law." United States v. Ashley, 606 F.3d 135, 143 (4th Cir. 2010); see 18 U.S.C. § 2(a) (providing that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal"). Thus, although Gautier may have been invited to conduct himself solely in the supporting role of driver, the particular laws he would have violated as an aider and abettor — namely, the offenses for which he was solicited — were necessarily the charged explosives offenses, and both of those include the requisite element of force. Barefoot's guilt of the solicitation offense underlying Count Three was therefore sufficiently established as to each essential element.[6]

---

[6] Barefoot does not challenge the government's evidence as to the sincerity element, except insofar as its sufficiency may be tied to the admission of the Petit evidence pursuant to Rule
(Continued)

26

2.

Barefoot also contests the sufficiency of the evidence supporting the jury's verdict on Count Four, finding him guilty of receiving an explosive that he intended to use for prohibited purposes. The statute of conviction provides, in pertinent part, that "[w]hoever transports or receives . . . in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property" is to be fined and imprisoned. 18 U.S.C. § 844(d). Barefoot correctly asserts that no witness at trial testified as to what he intended to do with the Kinestik cartridges he obtained in trade and then stored at his son's residence, where they were seized before being put to use.[7]

---

404(b). It suffices to say that we would have deemed the evidentiary issue moot had the proof of Barefoot's guilt on Count Three been insufficient notwithstanding the jury being allowed to consider his prior bad acts.

[7] The record lacks perfect clarity, making it a chore to discern a precise timeline of the case. During his debriefing, Barefoot described the events surrounding the Petit murder as having occurred in August 2001. See J.A. 70. At trial, the participants confirmed that the murder, prefaced by the meeting at Barefoot's residence, actually took place in early September 2001. See id. at 581, 685. Gautier, who was working for Barefoot's siding business and eventually came to live on his property for about a year, witnessed the trade for the Kinestik (Continued)

27

The government, of course, was not required to prove its case with direct accounts of Barefoot's state of mind. Indeed, as we have indicated a number of times, "a conviction may rely entirely on circumstantial evidence." See, e.g., United States v. Hassan, 742 F.3d 104, 139 (4th Cir. 2014) (internal quotation marks omitted). Here, Barefoot's acquisition of the cartridges only a short time after he solicited Gautier to bomb the courthouse permitted the inference that the explosives were intended to carry out that plan.

Moreover, the trial transcript discloses that Barefoot had assembled bombs, detonated them, and had often threatened to kill Sheriff Bizzell. See J.A. 629-30 (Maynard's testimony that he had seen Barefoot make pipe bombs); id. at 597, 630 (Gautier's and Maynard's accounts of Barefoot detonating small bombs in his backyard); id. at 599-600, 664 (Gautier's and Avery's confirmation that Barefoot had expressed on many occasions his desire to murder Bizzell by blowing up the courthouse). Giving the government the benefit of all reasonable inferences gleaned from the circumstantial evidence,

_____

cartridges no later than Christmas Day 2001, when he was forced to move out. See id. at 580-81, 600-01. Barefoot procured the cartridges, however, only after soliciting Gautier to help him bomb the courthouse, see id. at 601, which, according to the government's unchallenged representations, happened in or about November 2001, see id. at 34, 508-09.

28

we are assured that a rational trier of fact could have found Barefoot possessed the requisite culpable intent to sustain his conviction of Count Four.

D.

We now address the effect on this appeal of the Plea Agreement entered in the prior proceeding. In construing the meaning of the Agreement, we are guided by standard principles of contract law "to ensure that each party receives the benefit of the bargain." United States v. Jordan, 509 F.3d 191, 195 (4th Cir. 2007). Our aim is to enforce the Agreement's "plain language in its ordinary sense." Id. (internal quotation marks omitted).

1.

There is no dispute that, in exchange for Barefoot's statements at debriefing, the government honored its pledge to "not further prosecute [him] for conduct constituting the basis for the [2002] Indictment." Plea Agreement ¶ 4.c. Barefoot pleaded guilty to the single firearms offense charged, and he has not been federally prosecuted for any additional criminal conduct in connection with the firearms and ammunition seized during his traffic stop or by warrant thereafter.

The government's forbearance reflects the Agreement's grant of immunity to Barefoot for his unlawful acts intrinsic to the firearms indictment. Though the grant is unconditional, its

scope is confined to the underlying transaction. See Kastigar v. United States, 406 U.S. 441, 453 (1972) (explaining that transactional immunity "accords full immunity from prosecution," but only "for the offense" to which the defendant's statements relate). In illustration of that principle, we described transactional immunity as "protect[ing] an individual against prosecution for anything concerning the substance of compelled testimony." United States v. Harris, 973 F.2d 333, 336 (4th Cir. 1992) (emphasis added). The comprehensive bar from prosecution thereby afforded renders transactional immunity, in that respect, a "broader concept" than that of "[u]se immunity," which "protects against the government's use of compulsory testimony as a source of evidence, leaving the government free to use any other evidence to prosecute." Id.

When, as in Harris, the government is precluded from using the extracted statements not merely as trial ammunition but also as a source to develop additional evidence in aid of its investigation or prosecution of the defendant for any criminal activity, the resultant "immunity from use and derivative use" provides protection "coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." Kastigar, 406 U.S. at 453. In Kastigar, the Supreme Court rebuffed a

challenge to the constitutionality of the General Immunity Act of 1970, 18 U.S.C. §§ 6001-6005 (the "Act").

The Kastigar Court addressed a particular aspect of the Act specifying that when a witness in a federal proceeding has been ordered to testify in derogation of the Fifth Amendment privilege against self-incrimination, "no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case." 18 U.S.C. § 6002. By so providing, the statute "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege." Kastigar, 406 U.S. at 462; see In re Kilgo, 484 F.2d 1215, 1220 (4th Cir. 1973).

Although the statute controls only those proceedings in which a witness is formally compelled to speak by the presiding officer on the application of the government, federal prosecutors possess broad discretion to informally confer the same or similar protections to procure helpful testimony or information. See United States v. Richardson, 195 F.3d 192, 196 (4th Cir. 1999) (recounting the "long-standing and consistent policy of authorizing and encouraging grants of leniency and immunity . . . in exchange for truthful testimony"). The flexibility that inheres in this much more common method of

securing cooperation, in which the witness is offered "vest pocket" or "hip pocket" immunity (as it is sometimes known), is perhaps more accurately portrayed as "really [a] discretionary agreement[]" on the part of the government, United States v. Quatermain, Drax, 613 F.2d 38, 45 (3d Cir. 1980) (Aldisert, J., dissenting). These sort of informal agreements with federal prosecutors occasionally lead, as here, to disputes concerning the precise contours of the aegis so conferred.

2.

a.

Though the Plea Agreement indisputably granted Barefoot transactional immunity for the balance of his conduct intrinsic to the prior indictment and prosecution, the parties disagree on the protection afforded him regarding any unrelated, extrinsic offenses of which the government was alerted at the 2003 debriefing. Paragraph 4.f of the Agreement discloses that the government covenanted "not to use any information provided" by Barefoot "to prosecute him for additional crimes, except for crimes of violence." According to the government, the quoted language conferred upon Barefoot a species of limited immunity prohibiting only direct evidentiary use of his debriefing statements in prosecution of his nonviolent extrinsic offenses, and no immunity at all for any violent ones.

32

The government thus posits that its prosecution of Barefoot on the explosives charges constituting Counts Four through Six of the Superseding Indictment was not barred under the Plea Agreement, maintaining that the only statements it used against Barefoot at trial were those wherein he acknowledged his involvement in arranging the Petit murder. The Petit evidence, as discussed above, was admitted pursuant to Federal Rule of Evidence 404(b) exclusively in connection with the solicitation charge in Count Three.[8]

Barefoot chafes at the government's insistence on adhering to the letter of the Plea Agreement, contending that, near the outset of negotiations on December 2, 2002, the lead prosecutor represented that Barefoot would "get a walk" for any criminal activity he admitted during the debriefing. J.A. 93. During a subsequent phone conversation between counsel on December 17, 2002, Barefoot's lawyer was told that his client would get a "free pass this time on anything he talks about — one opportunity to tell all; will not prosecute him on what he talks about." Id. Finally, at the debriefing on January 21, 2003,

---

[8] Barefoot's motion to dismiss below, based on the government's asserted violation of the Plea Agreement and denied by the district court's August 22, 2011 order, targeted the entire Superseding Indictment. On appeal, Barefoot assigns error to the court's ruling only as it pertains to Counts Four through Six. See Br. of Appellant 41 n.7.

the interviewing agents urged Barefoot "to tell them everything he knew" about any explosives or bombs, because, in light of the Plea Agreement, "telling them where the bomb is cannot hurt him anymore."  Id. at 94.

Another aspect of the written Agreement, however, appears to foreclose Barefoot's broad characterization of the immunity conferred thereunder.  Immediately following the recitals, the Plea Agreement's initial numbered paragraph sets forth what is commonly referred to as a merger or integration clause.  See Restatement (Second) of Contracts § 209 (1981) (hereinafter "Restatement") (defining an "integrated agreement" as "a writing or writings constituting a final expression of one or more terms of an agreement").  Just as we would honor an integration clause to a contract, we honor one in a plea agreement.  See, e.g., United States v. Fentress, 792 F.2d 461, 464 (4th Cir. 1986) ("[A] fully integrated [plea] agreement . . . may not be supplemented with unmentioned terms."); see also United States v. Hunt, 205 F.3d 931, 935 (6th Cir. 2000) ("An integration clause normally prevents a criminal defendant, who has entered into a plea agreement, from asserting that the government made oral promises to him not contained in the plea agreement itself.").  The integration clause in this instance specifies that "[t]his Memorandum constitutes the full and complete record of the Plea Agreement.  There are no other agreements between

34

the parties in addition to or different from the terms herein."
Plea Agreement ¶ 1. Insofar as we are bound to give it force and effect, the clause precludes an interpretation of the Agreement that takes into account any preliminary oral representations inconsistent with its written form, because "[a]n integrated agreement supersedes contrary prior statements." Restatement § 209 cmt. a.[9]

Barefoot nonetheless reminds us that, although we apply standard precepts of construction to disputed plea agreements, those rules "may require . . . tempering in particular cases" to accommodate the reality that "the defendant's underlying 'contract' right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law." United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986) (citing Mabry v. Johnson, 467 U.S. 504, 509 (1984)).[10] In Harvey, the eponymous

---

[9] Although the exhortation by the agents at the debriefing that Barefoot "tell them everything he knew" might have reflected their understanding of the immunity arrangement, that conversation took place only after Barefoot had entered into the Plea Agreement and could not have influenced the decision he had already made. The agents' entreaties are therefore immaterial to this appeal.

[10] We elaborated in Harvey that "with respect to federal prosecutions, the courts' concerns run even wider than protection of the defendant's individual constitutional rights — to concerns for the 'honor of the government, public confidence in the fair administration of justice, and the effective
(Continued)

defendant pleaded guilty to one of nine indicted counts stemming from a hashish conspiracy. As consideration for his guilty plea, Harvey was promised that "the Government will move to dismiss the remaining counts," and "[t]he Eastern District of Virginia further agrees not to prosecute . . . HARVEY for any other possible violations . . . arising from the offenses set out in the indictment or the investigation giving rise to those charges." Id. at 296 n.1. An integration clause provided that the agreement was "the full and complete understanding of the parties." Id.

A few days after being released from imprisonment on his conviction, Harvey was arrested and indicted in the District of South Carolina on charges apparently related to the original investigation. The district court declined to enjoin those proceedings, ruling that the plea agreement immunized the defendant from prosecution only in the Eastern District of Virginia. Harvey was ultimately convicted on two counts of the second indictment.

We vacated the convictions, explaining that "both constitutional and supervisory concerns require holding the

administration of justice in a federal scheme of government.'" 791 F.2d at 300 (quoting United States v. Carter, 454 F.2d 426, 428 (4th Cir. 1972)).

36

Government to a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in plea agreements." Harvey, 791 F.2d at 300. The agreement at issue in Harvey was ambiguous, we determined, because it interchangeably referred to the "Government" and the "Eastern District of Virginia" as the party with whom the defendant contracted. Applying the foregoing principles, we construed the ambiguity in favor of Harvey, concluding that the government as a whole (and not just the government's agents in the Eastern District of Virginia) was bound by the agreement's grant of transactional immunity. See id. at 303; see also Restatement § 206 ("In choosing among the reasonable meanings of a promise or agreement or term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").

Harvey, unlike Barefoot here, did not seek to test the enforceability of a valid integration clause by attempting to introduce parol statements as bearing on the proper interpretation of a plea agreement. Our decision in that case is therefore largely unhelpful in analyzing the case at bar. In Harvey, the outcome instead turned on our more focused determination that the written terms of the integrated agreement were ambiguous. By contrast, the Plea Agreement now before us, notwithstanding its latent ambiguity regarding the latitude

37

retained by the government to use Barefoot's statements, see infra Part III.D.2.b.i, unambiguously excludes a broad grant of transactional immunity. Indeed, the plain language of the Agreement specifically contemplates the possibility of additional criminal proceedings against Barefoot — for crimes of violence — in which the government could use his debriefing statements against him.

Our decision in United States v. Garcia, 956 F.2d 41 (4th Cir. 1992), is closer to the point. The defendant in that case was offered a ten-year sentence to plead guilty to a cocaine conspiracy and testify against his compatriots. Although the defendant turned down that offer, he eventually bargained with the government to serve fifteen years and stand silent. The written plea agreement neglected to mention that no obligation had been imposed on the defendant to assist with additional prosecutions, but an accompanying cover letter to defense counsel confirmed that "the government will . . . not require as part of the plea agreement that the defendant cooperate with law enforcement." 956 F.2d at 42. A few months later, the defendant was subpoenaed to testify before the grand jury. He refused and was found in contempt, for which he served eighteen months in prison with no credit against his prior fifteen-year term.

The defendant filed a motion pursuant to 28 U.S.C. § 2255 to vacate or correct his underlying sentence, alleging that the plea agreement had been breached. The district court, confining its analysis to the four corners of the agreement, denied the motion. We granted relief, however, directing that the defendant be resentenced and credited with an additional eighteen months of time served, thereby nullifying the effect of the contempt citation. In so deciding, we declined to strictly enforce the parol evidence rule, perceiving "no avenue to relieve the government of a material promise contained in the cover letter." Garcia, 956 F.2d at 44. Instead, we determined that equitable considerations justified a less rigid approach than might otherwise be demanded, explaining that "[t]he government does not dispute that it made the promise — it just wants to take advantage of a rule of contract law to profit from an omission in a contract it prepared. We cannot countenance such unfair dealing." Id.

Our opinion in Garcia does not disclose whether the plea agreement there contained an integration clause, but we shall assume that it did. The key fact in Garcia is not the presence or absence of an integration clause in the plea agreement, but the rather unusual happenstance that the government's intent with respect to the disputed provision could be irrefutably derived from the surrounding circumstances. The government was

39

compelled to acquiesce in the defendant's account of the parties' accord inasmuch as it could hardly argue that it had somehow rejected or reconsidered the promise proven to have been made contemporaneously with the plea agreement.

The facts before us, by contrast, illustrate the more common situation that integration clauses are specifically designed to avoid. The most that can be gleaned from the record in the matter at bar is that the government twice expressed a certain amenability to granting Barefoot transactional immunity in exchange for complete and truthful revelations, but on occasions a full seven and five weeks, respectively, before the Plea Agreement was signed. There is simply no evidence of the government's position on immunity at any time proximate to the execution of the Plea Agreement except, of course, the written terms of the integrated Agreement itself. Harvey counsels that "[p]rivate law interpretive principles may be wholly dispositive in an appropriate case," 791 F.2d at 300, and, lacking sufficient analogy to the facts of Garcia, the dispute underlying the Plea Agreement is appropriately resolved without resort to equity.

b.

i.

Though not afforded an expansive transactional immunity, Barefoot was yet entitled under the Plea Agreement to have the

40

government forbear from using his debriefing statements with respect to some or all of the explosives offenses charged in Counts Four through Six. The government does not dispute that general proposition, but urges that we construe the Plea Agreement to have conferred nothing more than narrow "direct use" immunity, maintaining that it was barred only from introducing Barefoot's specific statements as substantive evidence of his guilt. During his debriefing, Barefoot related that "he received the liquid dynamite that was found at [Daniel's residence] from a friend of Nicholas Barefoot." J.A. 66. Barefoot volunteered in addition that he had bartered one of his hunting dogs for the explosives. See id. Neither of those statements were introduced for attribution at trial.

Barefoot nonetheless insists that he received a broad grant of use immunity under the Plea Agreement, in connection with which the government ceded all prerogative to make derivative or "indirect" use of his statements. Barefoot's understanding of the Agreement is that it is consistent with the interpretation of 18 U.S.C. § 6002 in Kastigar, in which the Supreme Court explained that "use and derivative use" immunity forecloses not only the government's direct evidentiary use of the immunized statements, but also its use of any "evidence derived therefrom." 406 U.S. at 443. Scarcely a year later, we confirmed through Judge Butzner, writing on behalf of a

41

unanimous panel, that "[u]se immunity prohibits the witness's compelled testimony and its fruits from being used in any manner in connection with criminal prosecution of the witness." In re Kilgo, 484 F.2d 1215, 1220 (4th Cir. 1973) (emphasis added) (citing Murphy v. Waterfront Comm'n of New York, 378 U.S. 52, 79 (1964)). Needless to say, the government's position on the proper interpretation of "use," as set forth in the Plea Agreement, is vastly different from the word's accepted meaning in the use immunity context, as explained by the Court in Kastigar and by Judge Butzner in Kilgo.

If Barefoot's more prevalent understanding is indeed the correct one, then the government would have been precluded from using — directly or indirectly — the statements or information derived therefrom to develop additional criminal charges against him, precisely the same as if it had proceeded formally under the immunity statute. See Harris, 973 F.2d at 336 (recognizing that use immunity conferred by agreement bound government in same manner as immunity statute, in that it could not "use the immunized testimony or any evidence derived from it either directly or indirectly"). Insofar as the derivative use bar applies here, it calls into question Gautier's and Maynard's testimony regarding the trade and Barefoot's storage of the explosives in his freezer. In addition, Daniel testified that Barefoot had later removed the explosives from the freezer and

42

given them to him for safekeeping.  The government referred at length to the trade and the handoff to Daniel during its opening statement, see J.A. 521-23, candidly acknowledging to the jury that the entire "investigation initially focused on this liquid explosive," id. at 524.  There is scant reason to believe that Barefoot would have been prosecuted on Counts Four through Six had he not mentioned the liquid explosives during his debriefing.

Not long ago, we had occasion to explain that, when the defendant is not under judicial compulsion to provide information but does so in accordance with a voluntary agreement entered into with the United States Attorney, the scope of any immunity thereby afforded "is a matter of contract interpretation that depends on the language in the agreement itself."  See United States v. Smith, 452 F.3d 323, 337 (4th Cir. 2006).  We determined that the plea agreement in Smith "unambiguously conferred use immunity only" because it stipulated that the government "will not use against [Defendant], in any criminal proceeding, any of the information or materials . . . provided."  Id.

Although the government does not rely on Smith as affecting this case, the pertinent language in the Plea Agreement begins in somewhat the same fashion.  To reiterate, the Agreement attests that the government would not "use any information

43

provided by [Barefoot] . . . to prosecute him for additional crimes," a straightforward prohibition that it then qualifies with the words "except for crimes of violence." Plea Agreement ¶ 4.f. Notably, the term "crimes of violence" is nowhere defined in the Plea Agreement.

A fundamental canon of contract construction is that "[a] writing is interpreted as a whole." Restatement § 202. Most commonly, the rule expressed in section 202 serves to harmonize potentially conflicting provisions that may appear in divergent, seemingly unrelated parts of the contract — the "writing" — to ensure that that each term is given proper meaning and significance. Just as importantly, however, the canon counsels against parsing lesser contract components, which may also constitute "writings." The commentary to section 202 instructs that "[a] word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph. A longer writing similarly affects the paragraph, other related writings affect the particular writing, and the circumstances affect the whole." Id. § 202 cmt. d. Thus, the ambiguity attendant to the undefined term "crimes of violence" renders uncertain the scope of the immunity conferred by Paragraph 4.f of the Plea Agreement, such that we cannot be assured that the provision was intended to convey the same meaning as its unambiguous counterpart in Smith.

44

We again keep in mind that all ambiguities in the Plea Agreement are to be construed against the government as its drafter. That being the case, we are content to adopt the controlling rule in other circuits, expressed as follows: "The common understanding . . . in the criminal justice world" of use immunity (which the government acknowledges Barefoot to possess), is that such immunity means the same in a plea agreement as it does in 18 U.S.C. § 6002, which is to say "that it encompasses derivative use immunity." United States v. Plummer, 941 F.2d 799, 804 (9th Cir. 1991); see United States v. Harper, 643 F.3d 135, 140 n.1 (5th Cir. 2011) (observing that "[t]his Court has tended to interpret 'use immunity' as a term of art that covers both direct and derivative use of immunized statements"); United States v. Kilroy, 27 F.3d 679, 685 (D.C. Cir. 1994) (expressing agreement with Plummer that "nothing else appearing, an informal use immunity afforded by agreement, e.g., a plea bargain, includes derivative use immunity equivalent to that afforded by [18 U.S.C. § 6002]").[11]

---

[11] The unanimity of authority establishes that the terms "use immunity" (as it is often called in writings) and its "pocket" cousins (the more colorful, typically oral shorthand) have acquired a meaning conterminous with § 6002, one readily recognized among prosecutors, the criminal defense bar, and the federal judiciary. See Harris, 973 F.2d at 336 (identifying the source of use immunity in that case as "[t]he agreement between Harris and the government . . . [that] operated as use and derivative use immunity for compelled testimony"). It is (Continued)

Moreover, the parties' inclusion of the crimes-of-violence exception within the immunity provision persuasively indicates that they did not intend that the government forbear from solely direct use. A promise to merely refrain from introducing the defendant's statements at trial is scarcely more than a crumb of the challah that the government may seek to bestow. Presenting nowhere near the impediment to its interests as the more constrictive immunity from derivative use, the government's portrayal of what use immunity should mean in Barefoot's case hardly seems a burden worth taking the trouble to alleviate through negotiations. Rather than expose its trial tactics to potential constitutional challenge, see Harris, 973 F.2d at 336 (detailing government's appeal of indictment's partial dismissal on ground that it violated provisions of use immunity agreement, infringing on defendant's Fifth Amendment privilege against

---

therefore imperative that, if these terms are intended in a particular instance to convey something other than § 6002 use immunity, the government bear the burden of making that different meaning explicit to the defendant. Were we to accept as accurate the government's characterization of the ambiguous immunity provisions of the Plea Agreement, we would risk radically altering the settled legal landscape that has demonstrably been in place for more than thirty years, and likely even longer. See United States v. Barber, 668 F.2d 778, 781-82 (4th Cir. 1982) (construing government's implicit oral representations as grant of "use immunity," which supported district court's finding that defendant was assured that his responses to interview questions "would not be used against him directly or through leads gained therefrom").

self-incrimination), it is far more likely that the government would strenuously bargain to maintain the option to prosecute in the event that the debriefing session led it to discover theretofore unknown violent misconduct on the part of the defendant. We therefore conclude that Barefoot, pursuant to his Agreement with the United States Attorney, was entitled to use immunity as it is commonly understood, that is, immunity from either direct or indirect (derivative) use, except to the extent that his criminal acts constituted crimes of violence.

ii.

To decide whether any or all of Counts Four through Six encompassed crimes of violence, we start with the proposition that "where language has a generally prevailing meaning, it is interpreted in accordance with that meaning." Restatement § 202(3)(a). Further, "technical terms and words of art are given their technical meaning when used in a transaction within their technical field." Id. § 202(b)(b).

When the Plea Agreement was executed in January 2003, federal criminal litigants would have been most readily familiar with the legal term "crime of violence" as set forth in the November 2002 edition of the Sentencing Guidelines. As defined therein and pertinent here, a crime of violence is "any offense . . . punishable by imprisonment for a term exceeding one year," having "as an element the use, attempted use, or threatened use

47

of physical force against the person of another, or . . . [that] involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."  USSG § 4B1.2(a).

Barefoot's conviction in Count Four of receiving an explosive with the intent that it be used to kill, injure, or intimidate, or to damage or destroy buildings, manifestly would have been a crime of violence according to the parties' mutual understanding.  Hence, the government was unquestionably entitled to the benefit of its bargain and in no way precluded from using the information it procured from Barefoot during his debriefing to investigate, charge, and convict him of that offense.

Our conclusion is different with respect to Barefoot's Count Five conviction of improperly storing explosive materials, and also his conviction under Count Six of distributing explosive materials to a person not yet twenty-one.  The storage offense charged in Count Five, being a misdemeanor, could not have qualified as a crime of violence.  Count Six presents a closer question.  Though the conduct therein charged is a felony, it is by no means certain that the routine distribution of explosive materials, typically unaccompanied by physical force, nevertheless entails their "use" such as to bring the offense within the Guidelines definition.  We are also unwilling

48

to assume that every such distribution carries with it a serious potential risk of injury to the recipient. For example, the Kinestik cartridges at issue here, being a binary explosive, were relatively harmless until mixed.

We do not need to attempt any definitive resolution of the question of whether the offense charged in Count 6 is or is not a crime of violence. It suffices to note that the issue is on the edge. The lack of clarity on the point inures to Barefoot's benefit, and we are constrained to determine that the government violated the Plea Agreement when it prosecuted him on Count Five and on Count Six. Barefoot seeks reversal of those convictions as his preferred remedy for the government's broken promise, see Br. of Appellant at 50, and we perceive no reason to withhold the requested relief. We therefore move on to ascertain the effect on Barefoot's sentence, if any, prompted by our erasure of the two improper convictions. To best accomplish that, we first analyze whether the sentence was correctly imposed with those convictions included.

E.

1.

Barefoot challenges in two respects the district court's calculation of his advisory range of imprisonment under the Guidelines. At the outset, Barefoot contends that the court erred in discerning any connection, for grouping purposes,

49

between his convictions of the firearms offenses in Counts One and Two and his convictions involving explosives in Counts Three through Six. The perceived association between the stolen firearms and the bombs that Barefoot made — or was preparing to make — also served to increase the base offense level applied by the court, which is likewise assigned as error.

At the sentencing hearing, the district court adopted the calculations set forth in the Presentence Investigation Report (the "PSR"), using the 2002 edition of the Guidelines. The purpose of grouping is to "determin[e] a single offense level that encompasses all the counts of which the defendant is convicted." USSG Ch. 3, Pt. D, intro. comment. (2002). To accomplish this task, the PSR initially combined four of Barefoot's six offenses of conviction into two groups: the two firearms offenses charged in Counts One and Two (the "firearms group") and the explosives receiving and distributing offenses charged in Counts Four and Six (the "explosives group"). See USSG § 3D1.2(d), comment. (n.6) (providing that "most property crimes . . . , firearms offenses, and other crimes where the guidelines are based primarily on quantity or contemplate continuing behavior are to be grouped together").

The PSR then grouped the Count Three conviction with both the firearms group and the explosives group on the ground that the solicitation offense therein "embodie[d] conduct that is

50

treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." USSG § 3D1.2(c).[12] The firearms offenses are governed by Guidelines section 2K2.1, which provides for a base offense level of 18 if "the offense involved a firearm described in 26 U.S.C. § 5845(a)." Id. § 2K2.1(a)(5). The referenced statute defines certain extravagant weaponry such as sawed-off shotguns, machine guns, silencers, and — as relevant here — "destructive device(s)." 28 U.S.C. § 5845(a)(8). Many types of weapons may constitute a destructive device, including "any explosive [or] incendiary . . . bomb," id. § 5845(f), and the pipe bombs that Barefoot manufactured and detonated (as well as whatever mechanism he contemplated would house the liquid dynamite) certainly qualify.

The PSR increased Barefoot's base offense level by six for the number of firearms involved, see USSG § 2K2.1(b)(1)(C), by two because of the involvement of a destructive device, see id. § 2K2.1(b)(3), and by two because one or more of the firearms had been stolen, see id. § 2K2.1(b)(4). Barefoot also received an upward adjustment of four levels for his role as an organizer or leader, see id. § 3B1.1(a), and an additional two levels for

---

[12] The PSR, without objection, grouped the Count Five storage misdemeanor with the related offenses in the firearms group.

51

using a minor to assist him in avoiding detection, see id. § 3B1.4. The resultant adjusted offense level of 34, cross-referenced with Barefoot's criminal history category of II, produced an advisory Guidelines range of 168 to 210 months of imprisonment. Because none of the offenses of conviction entailed a maximum term of longer than 120 months, the district court comported with the advisory range by first sentencing Barefoot to the 60-month maximum on Count One. The court then directed that Barefoot serve a consecutive term of 120 months on Counts Two through Four and Count Six, to run concurrently with each other. The court last addressed the Count Five misdemeanor, on which it imposed a 12-month term concurrent with the aggregate 180-month sentence.

Barefoot protests that his conduct giving rise to the firearms offenses was wholly discrete from his possession and use of destructive devices, and thus the district court was incorrect to connect the two. A compartmentalized approach, according to Barefoot, would have resulted in a firearms base offense level of 12 instead of 18, increased by 14 levels and not 16, for an adjusted offense level of 26. Under the grouping rules, the separately considered solicitation conviction in Count Three, being predominant among the explosives offenses at base offense level 24, would have added two levels. See USSG § 3D1.4(a). Using this method of calculation, Barefoot's final

52

offense level of 28 would have resulted in an advisory Guidelines range of 87 to 108 months.

The district court properly evaluated the charged criminal conduct as a unitary whole. To calculate the base offense level for the firearms offenses, the court was bound to consider together the entirety of Barefoot's relevant conduct, including "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG § 1B1.3(a)(1). In so doing, the court's analysis need not have been strictly confined to the conduct underlying the convictions; it was permitted to examine as relevant "the conduct of other offenses insofar as they were part of the same course of conduct." United States v. McVey, No. 13-4285, 2014 WL 1613908, at *3 (4th Cir. Apr. 23, 2014) (internal quotation marks omitted).

To begin with, Barefoot's conduct with respect to the explosives took place during the same time as the ongoing firearms conspiracy. See McVey, 2014 WL 1613908, at *3 (instructing that time interval is one factor "appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same

course of conduct"). Daniel, having been involved not only in the theft and concealment of the firearms, but also in helping his father conceal the liquid dynamite, provides a more direct link unifying Barefoot's activities; indeed, one of the stolen firearms was recovered from Daniel's residence along with the Kinestik explosives. At a more general (but yet relevant) level, Barefoot's illegal possession of firearms and explosives can together be seen as facilitating his Klan activities.

Viewed in the proper context, it is evident that the district court did not clearly err in ascertaining a connection between the firearms offenses and the explosives offenses. That connection permitted the court to apply the higher base offense level to the firearms offenses, and it also supported the court's grouping of the various offenses for sentencing purposes into what was, more or less, a unified whole.

## 2.

It is apparent from our detailed recitation of the district court's sentencing calculus that Barefoot's convictions of Count Five and Count Six had no material effect on his sentence. The term of imprisonment associated with Count Six was ordered to run concurrently with the same terms imposed on Counts Two through Four. Among those convictions, Count Two determined the advisory Guidelines range, and the grouping therewith of Count Four would have achieved the same result with or without the

54

addition of Count Six. Compared to his serious felony offenses, Barefoot's misdemeanor conviction of Count Five and the twelve-month concurrent sentence imposed thereon was virtually an afterthought.

Consequently, as then-Judge Sotomayor observed in a similar instance on behalf of the court of appeals in Burrell v. United States, Barefoot's circumstances present "one of the rare cases . . . where our reversal of a conviction [does] not affect the knot of calculations under the Guidelines," obviating any need to remand for resentencing. 467 F.3d 160, 166 (2d Cir. 2006) (internal quotation marks omitted). As the Fifth Circuit explained in United States v. Thomas, "[w]here it is clear that a conviction that is being reversed did not cause a district court to impose a harsher sentence on a conviction that is being affirmed, remand for re-sentencing is not necessary." 690 F.3d 358, 372 (5th Cir. 2012); see United States v. Lopez, 42 F.3d 463, 469 (8th Cir. 1994) (acknowledging that defendant need not be resentenced if conviction vacated on appeal "had no effect on the determination of . . . Guidelines ranges" (internal quotation marks omitted)); accord United States v. Introcaso, 506 F.3d 260, 272 (3d Cir. 2007); United States v. Fontana, 948 F.2d 796, 798 (1st Cir. 1991).

The court in Burrell had previously reversed the defendant's conviction for conspiracy to distribute crack

cocaine on the ground that it was a lesser-included offense of his other conviction for being an organizer of a continuing criminal enterprise. Because the latter conviction carried a mandatory life sentence, the Second Circuit remanded to the district court for it to perform a strictly "ministerial correction" to enter "an amended judgment reflecting the dismissal." Id.

We do the same here. On remand, the district court is simply to amend the judgment against Barefoot to dismiss Counts Five and Six, nullifying the convictions and sentences relating thereto. In so doing, the court shall reduce Barefoot's special assessment from $525 to $400, in that the $25 assessed on the Count Five misdemeanor conviction, see 18 U.S.C. § 3013(a)(1)(A)(iii), and the $100 assessed on the Count Six felony conviction, see id. § 3013(a)(2)(A), are no longer valid and enforceable components of the judgment. See Thomas, 690 F.3d at 372; Introcaso, 506 F.3d at 273.

## IV.

Pursuant to the foregoing, we affirm Barefoot's convictions on Counts One through Four, but we reverse his convictions on Counts Five and Six. We remand this matter to the district court with instructions to enter an amended judgment in

conformance with this opinion.

<u>AFFIRMED IN PART, REVERSED IN PART,</u>
<u>AND REMANDED WITH INSTRUCTIONS</u>